**No. 25-2923**

# In the United States Court of Appeals for the Third Circuit

---

ARM LTD., APPELLANT

*v.*

QUALCOMM INC.; QUALCOMM TECHNOLOGIES, INC.;
NUVIA, INC., APPELLEES

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE (CIV. NO. 22-1146)
(THE HONORABLE MARYELLEN NOREIKA, J.)*

---

**CORRECTED BRIEF OF APPELLEES**

---

KAREN L. DUNN
WILLIAM A. ISAACSON
DUNN ISAACSON RHEE LLP
 401 Ninth Street, N.W.
 Washington, DC 20004

ERIN J. MORGAN
DUNN ISAACSON RHEE LLP
 11 Park Place
 New York, NY 10007

KANNON K. SHANMUGAM
MASHA HANSFORD
WILLIAM T. MARKS
JAMES DURLING
MATTHEW J. DISLER
AUSTIN W. PIATT
PAUL, WEISS, RIFKIND,
 WHARTON & GARRISON LLP
 2001 K Street, N.W.
 Washington, DC 20006
 (202) 223-7300
 kshanmugam@paulweiss.com

CATHERINE NYARADY
JACOB A. BRALY
PAUL, WEISS, RIFKIND,
 WHARTON & GARRISON LLP
 1285 Avenue of the Americas
 New York, NY 10019

## CORPORATE DISCLOSURE STATEMENT

Appellee Qualcomm Incorporated has no parent corporation, and no publicly held company owns 10% or more of its stock.

Appellee Qualcomm Technologies, Inc., is a wholly owned direct subsidiary of Qualcomm Incorporated.

Appellee Nuvia, Inc., is a wholly owned indirect subsidiary of Qualcomm Incorporated.

## TABLE OF CONTENTS

Page

Introduction ................................................................................................ 1

Statement of jurisdiction ........................................................................ 4

Statement of the issues ........................................................................... 5

Statement of related cases and proceedings ..................................... 5

Statement of the case ............................................................................... 5

    I.    Factual background ...................................................................... 5

        A.    Qualcomm's chip business ................................................. 5

        B.    Qualcomm's license agreements with Arm .................. 7

        C.    Qualcomm's acquisition of Nuvia ................................... 9

        D.    Qualcomm's post-acquisition CPU development .......... 11

        E.    Arm's post-acquisition actions ....................................... 13

    II.    Procedural history ...................................................................... 15

Summary of argument ............................................................................ 22

Standard of review .................................................................................. 25

Argument .................................................................................................... 25

    I.    The district court correctly denied judgment as a matter of law for Arm on Qualcomm's counterclaim ................................. 25

        A.    The jury permissibly found that the Qualcomm ALA covers Qualcomm's post-acquisition CPUs .............................. 26

        B.    Arm's contrary arguments are incorrect ................................. 32

            1.    Arm's post-trial request for the district court to interpret the Qualcomm ALA was improper ............. 32

            2.    Even if the meaning of the Qualcomm ALA was a question for the district court, Arm would still not prevail ............................................................... 37

Page

Table of contents—continued:

II.   The district court properly granted judgment as a matter of law
      for Nuvia on Arm's claim for breach of the Nuvia ALA ................... 43

      A.   Arm failed to present sufficient evidence of harm
           from Nuvia's alleged breach of contract ................................. 43

      B.   Arm's proffered theories of harm lack merit ........................... 44

           1.   Licensing ecosystem ....................................................... 44

           2.   Lost royalties ................................................................... 47

           3.   Harm from the alleged breach itself .............................. 50

III.  A new trial on all claims is not warranted if Arm prevails
      on either of its arguments on appeal ......................................... 52

Conclusion ................................................................................................. 58

## TABLE OF AUTHORITIES

### CASES

*Aguilera* v. *Pirelli Armstrong Tire Corp.*,
   223 F.3d 1010 (9th Cir. 2000) ................................................... 44, 45

*Ambrose* v. *Township of Robinson*, 303 F.3d 488 (3d Cir. 2002) .................... 50

*American Home Assurance Co.* v. *Sunshine Supermarket, Inc.*,
   753 F.2d 321 (3d Cir. 1985) ............................................................. 55

*Armstrong* v. *Burdette Tomlin Memorial Hospital*,
   438 F.3d 240 (3d Cir. 2006) ................................................. 52, 53, 54

*Artifex Software, Inc.* v. *Hancom, Inc.*, Civ. No. 16-6982,
   2017 WL 1477373 (N.D. Cal. Apr. 25, 2017) ................................... 46

*City of Hope National Medical Center* v. *Genentech, Inc.*,
   181 P.3d 142 (Cal. 2008) ................................................... 26, 27, 32

iii

Page

Cases—continued:

*Cooper Distribution Co.* v. *Amana Refrigeration, Inc.*,
   180 F.3d 542 (3d Cir. 1999) ...............................................................34

*Darbun Enterprises, Inc.* v. *San Fernando Community
   Hospital*, 191 Cal. Rptr. 3d 340 (Ct. App. 2015).................................43, 51

*DVD Copy Control Association, Inc.* v. *Kaleidescape, Inc.*,
   Civ. No. 1-04-31829, 2012 WL 12987159
   (Cal. Super. Ct. Jan. 9, 2012) ...........................................................46

*Facebook, Inc.* v. *Duguid*, 592 U.S. 395 (2021) ...................................40

*Hana Financial, Inc.* v. *Hana Bank*, 574 U.S. 418 (2015) ...............41

*Kars 4 Kids Inc.* v. *America Can!*, 8 F.4th 209 (3d Cir. 2021) ........25

*McCaig* v. *Wells Fargo Bank (Texas), N.A.*,
   788 F.3d 463 (5th Cir. 2015)..............................................................34

*Morey* v. *Vannucci*, 75 Cal. Rptr. 2d 573 (Ct. App. 1998)...............36, 37, 42, 43

*O'Brien* v. *Middle East Forum*, 57 F.4th 110 (3d Cir. 2023)...........57

*Pacific Gas & Electric Co.* v. *G.W. Thomas Drayage
   & Rigging Co.*, 442 P.2d 641 (Cal. 1968)..........................................26, 37

*Parsons* v. *Bristol Development Co.*, 402 P.2d 839 (Cal. 1965) .........27

*Robinson* v. *First State Community Action Agency*,
   920 F.3d 182 (3d Cir. 2019) ..............................................................34

*Safeco Insurance Co.* v. *Robert S.*, 28 P.3d 889 (Cal. 2001) .........37, 38

*Southern California Edison Co.* v. *Superior Court*,
   44 Cal. Rptr. 2d 227 (Ct. App. 1995).................................................29, 42

*Spence* v. *Board of Education of Christina School District*,
   806 F.2d 1198 (3d Cir. 1986) .............................................................55

Page

Cases—continued:

*United States* v. *Ozcelik*, 527 F.3d 88 (3d Cir. 2008)..........................34

*Vizzini* v. *Ford Motor Co.*, 569 F.2d 754 (3d Cir. 1977) ....................52

*Warner Construction Corp.* v. *City of Los Angeles*,
    466 P.2d 996 (Cal. 1970) ..........................................35

*Whelan* v. *Abell*, 48 F.3d 1247 (D.C. Cir. 1995) ....................54, 55

*Wilkison* v. *Wiederkehr*, 124 Cal. Rptr. 2d 631 (Ct. App. 2002).......47

*Williams* v. *Rene*, 72 F.3d 1096 (3d Cir. 1995) ........................55

*Wolf* v. *Walt Disney Pictures & Television*,
    76 Cal. Rptr. 3d 585 (Ct. App. 2008) ............................26

*ZF Meritor, LLC* v. *Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012)........25

## STATUTES AND RULES

15 U.S.C. § 1121(a).....................................................4

28 U.S.C. § 1291 ......................................................4

28 U.S.C. § 1331 ......................................................4

28 U.S.C. § 1332 ......................................................4

28 U.S.C. § 1367(a)....................................................4

Cal. Civ. Proc. Code § 1858..........................................38

Fed. R. Civ. P. 37(c).................................................48

Fed. R. Civ. P. 50 ...................................................49

Fed. R. Civ. P. 50(a)................................................33

Fed. R. Civ. P. 50(b) ...............................................35

# MISCELLANEOUS

Page

*American Heritage Dictionary of the English Language* (5th ed. 2018).......28

Judicial Council of California Civil Jury Instructions (2024 ed.) .....................33

*Webster's Third New International Dictionary* (2002)....................................28

## INTRODUCTION

In recent years, as its business model has shifted, Arm has increasingly come to view its longtime customer Qualcomm as a competitive threat. Arm's desire to forestall that perceived threat led it to file suit alleging breach of a license agreement between itself and Nuvia, a company that Qualcomm had acquired. Rather than seeking damages, however, Arm demanded the destruction of products Qualcomm had developed. The jury determined that Qualcomm did not breach the Nuvia agreement and the products at issue were licensed under Qualcomm's own license with Arm; the district court separately entered judgment as a matter of law that Nuvia also was not liable for breach of its agreement. Those decisions were correct and should be affirmed.

Qualcomm is a global leader in the development of microprocessors. Its leading line of microprocessors is called Snapdragon and uses central processing units (or CPUs) custom designed by Qualcomm.

Designing a custom CPU is an arduous task. It requires years of work by hundreds of specialized engineers. The circuitry design of a CPU, which governs its performance and power usage, is known as "microarchitecture." Microarchitecture is distinct from "instruction-set architecture" (or simply "architecture"), which is a set of digital rules that tells software programmers how to write software code that the microarchitecture can execute.

The custom CPUs in Qualcomm's Snapdragon microprocessors are compatible with an instruction-set architecture developed by Arm. Qualcomm

(1)

holds a license that allows it to design and market custom CPUs compatible with Arm's instruction-set architecture. Under that license, Qualcomm has broad rights "to use the applicable ARM Technology to design and have designed, including all stages of implementation from specification th[r]ough RTL design to generation of GDSII . . . Architecture Compliant Cores." Appx6935.

Qualcomm entered its current license agreement with Arm in 2013. After that license was executed, Arm's business model changed. Under the supervision of the investment fund that acquired Arm in 2016, Arm transitioned its business model from its neutral approach to licensing its architecture to exploiting its control over the architecture to extract increasing royalties and, eventually, to competing directly with Qualcomm, its customer. Qualcomm's license to use Arm's architecture presented a direct threat to those plans.

In 2021, Qualcomm acquired Nuvia, a startup working on an Arm-compatible CPU for microprocessors to be used in computer servers. Qualcomm informed Arm that Nuvia's work and employees would transfer to Qualcomm and that the former Nuvia employees would continue their activities under Qualcomm's own license agreement. Using its broad design rights under the Qualcomm agreement, Qualcomm then began work on its Snapdragon microprocessors, ultimately incorporating some of Nuvia's pre-acquisition design

work into the newly designed custom CPUs for the personal-computer, mobile, and automotive markets.

Nearly one year after Qualcomm acquired Nuvia, Arm terminated Nuvia's license agreement and tried to use the agreement's termination provision to demand that Qualcomm destroy its new CPUs. Arm then sued both Qualcomm and Nuvia for breach of the Nuvia license agreement, seeking specific performance of a provision that Arm alleged required the CPUs' destruction. Qualcomm counterclaimed for a declaration that its CPUs were licensed under its own license agreement with Arm.

A jury found that Qualcomm's CPUs were licensed under the Qualcomm agreement and that Qualcomm did not breach Nuvia's license agreement. But the jury could not reach a verdict on Arm's breach-of-contract claim against Nuvia. On post-trial motions, the district court declined to disturb the jury's verdicts in Qualcomm's favor and entered judgment as a matter of law for Nuvia, determining that Arm failed to prove the element of harm.

Arm offers no valid basis for reversing the judgment or obtaining a new trial. The jury was properly tasked under California law—at the parties' joint proposal—with interpreting Qualcomm's license agreement. And the jury heard substantial evidence that Qualcomm's license covered Qualcomm's new custom CPUs. The plain text of the license agreement allows Qualcomm to use the relevant "ARM Technology" to "design" Arm-compliant CPUs "at all

stages of implementation." Arm's own employees agreed internally that Qualcomm's license would allow it to incorporate Nuvia's design work into new Qualcomm-designed CPUs. And the record contained extensive evidence that all of the steps of development for the new custom CPUs occurred at Qualcomm.

The district court also correctly entered judgment as a matter of law for Nuvia. The court determined that, having disclaimed monetary relief in order to pursue specific performance, Arm could not rely on a lost-royalties theory of harm on its breach-of-contract claim against Nuvia. And the record contained no other evidence of harm. Arm thus failed to prove an essential element of its claim against Nuvia.

The district court correctly brought this case to an end. Its judgment should be affirmed.

## STATEMENT OF JURISDICTION

The judgment of the district court was entered on September 30, 2025. Appx0023. Arm filed a notice of appeal on October 1, 2025. Appx0024-0025. This Court has jurisdiction under 28 U.S.C. § 1291. The district court had jurisdiction under 15 U.S.C. § 1121(a) and 28 U.S.C. §§ 1331, 1332, and 1367(a).

## STATEMENT OF THE ISSUES

1.    Whether the district court correctly denied judgment as a matter of law to Arm on Qualcomm's counterclaim that the license in Qualcomm's Architecture License Agreement with Arm covered the CPUs in Qualcomm's Snapdragon microprocessors.

2.    Whether the district court correctly granted judgment as a matter of law to Nuvia on Arm's breach-of-contract claim for failure to prove harm.

3.    Whether a new trial on all claims is required if the Court grants relief to Arm on appeal.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not previously been before this Court.  Two related cases are pending before the district court:  *Qualcomm Inc.* v. *Arm Holdings plc*, Civ. No. 24-490 (D. Del.); *Qualcomm Inc.* v. *Arm Ltd.*, Civ. No. 26-20 (D. Del.).

## STATEMENT OF THE CASE

## I.    FACTUAL BACKGROUND

### A.    Qualcomm's Chip Business

Qualcomm is an industry-leading innovator in mobile communication products and semiconductors.  Appx6228-6230.  Its newest Snapdragon line of microprocessors, designed for the personal-computer, mobile, and automotive markets, incorporates the fastest and best-performing custom CPUs on the market.  Appx5870-5871, 6255-6256.

Arm historically operated as an intellectual-property licensing business that created and licensed an instruction-set architecture—a digital set of rules that functions as a communications interface between software and the CPU inside a device—and CPU designs that implemented that architecture. Appx0028-0031, 6131, 9047. The instruction-set architecture contains no information regarding the actual design of any portion of a CPU. Appx6132, 9050. Arm periodically releases new "versions" of its architecture. Appx9052-9053, 9357.

A chip's CPU (or core) functions as a microprocessor's "brain" by processing operating instructions from a computer's software and managing data flow. Appx5664, 6130, 6139-6140, 6142. Engineers refer to the design of a CPU as the "microarchitecture," which is the circuitry that enables the CPU to execute software instructions (which use a particular instruction-set architecture). Appx6130-6131. To create a microarchitecture, engineers write source code, known as Register Transfer Language (RTL), which is used to define the structures and circuitry comprising a physical chip. Appx5891, 6130-6131, 6135-6138, 6185.

Differences in microarchitecture design distinguish CPUs from one another. For example, the design choices made to support the different perfor-

mance and power constraints for personal computers, mobile phones, or servers result in significantly different microarchitectures. *See, e.g.*, Appx5870-5873, 5876-5877, 6144-6145.

Arm's instruction-set architecture is set forth in a publicly available reference manual. Appx5817, 5896. The manual lists various instructions in the form of binary codes, known as opcodes, that software and a CPU must understand to communicate with each other. Appx5992. It also contains register definitions, which define how data is stored within a CPU and allow software to understand if the CPU supports various features. Appx5892, 6139-6141. Those opcodes and register definitions accounted for approximately 1% or less of the RTL for Qualcomm's custom CPUs. Appx5891, 6150-6152.

### B. Qualcomm's License Agreements With Arm

Arm licenses use of its architecture through two types of agreements: Architecture License Agreements (ALAs) and Technology License Agreements (TLAs). Appx0031-0032. An ALA is a license to use certain Arm technology to design and sell products with custom Arm-compatible CPUs designed by the customer. Appx0031-0032, 6886-6928, 8922. Each version of the Arm architecture is licensed through a separate annex to a customer's ALA. *See, e.g.*, Appx6869, 6929, 6956. By contrast, under a TLA, Arm delivers to the customer a complete, ready-to-use CPU design with microarchitecture supplied by Arm for incorporation into the customer's products. Appx5866.

Qualcomm first entered an ALA and a TLA with Arm in 2003 and 1997, respectively. Appx6013. It renegotiated both agreements in 2013, with the ALA term extending until 2033. Appx6012-6013, 6886, 6911. The royalties Arm charges Qualcomm are lower under the ALA than the TLA. Appx5634.

The annex to the Qualcomm ALA grants Qualcomm the broad right to "use the applicable ARM Technology to design and have designed, including all stages of implementation from specification th[r]ough RTL design to generation of GDSII (subject to Clause 2.2 of the ALA) Architecture Compliant Cores." Appx6935; *see* Appx6962. That annex defines "Architecture Compliant Core" as "a microprocessor core developed by or for LICENSEE under the licences granted in" the annex and satisfying 10 technical requirements. Appx6932.

In 2016, the Japanese investment fund SoftBank acquired Arm, and Arm began changing its historically "neutral" licensing practices to increase profits, eventually telling British regulators that Arm is "*not* strictly 'neutral' today" but rather "consistently seeks to maximize its own profits." Appx8925; *see* Appx5695, 6230-6231. In 2019, Arm launched an internal project to increase royalties for its off-the-shelf CPUs. Appx5604-5608; *see* Appx8621. By 2021, Arm even began to discuss building its own physical chips, a step that would place it in direct competition with Qualcomm. Appx5746-5750, 8899.

When Arm began to change its business model, Qualcomm was using off-the-shelf Arm CPUs under its TLA. Appx6233. But those CPUs had fallen behind in performance compared to custom Arm-compatible CPUs created by Apple. Qualcomm repeatedly raised concerns about the performance of the Arm CPUs that Qualcomm was using, but the performance did not improve. Appx6117-6118, 6233-6234, 8624-8625, 8629. Qualcomm thus began looking to develop its own custom CPUs under its ALA. Appx8590, 8592.

### C.    Qualcomm's Acquisition Of Nuvia

In 2019, a renowned team of developers of Arm-compatible CPUs and microprocessors founded a startup called Nuvia. Appx7108-7109. Nuvia aimed to create a custom CPU for computer servers and entered an ALA with Arm. Appx5867, 6836, 6853, 6869. Nuvia's ALA defines "Nuvia Technology" as "the technology developed by Licensee" (that is, Nuvia), and it defines "ARM Technology" to include specific deliverables Arm was required to supply. Appx6836, 6838. Nuvia bargained for that distinction with the "intent to protect all of the technology that Nuvia created." Appx5878-5883, 8594-8596, 9224, 9228, 9230.

In January 2021, Qualcomm announced that it planned to acquire Nuvia. Appx7108. Shortly after the announcement, Qualcomm informed Arm that it "intend[ed] to transfer [Nuvia's] work and employees to [Qualcomm] and have

9

the then former [Nuvia] employees continue their activities under the Qualcomm ALA and TLA, as that will be their current employer." Appx9334.

In internal communications, Arm executives expressed concern about the acquisition's potential implications for Arm's revenue, as Qualcomm's royalty rate under its ALA was lower than Nuvia's rate. *See* Appx5634. One senior vice president wrote that he was "struggling not to be pissed that [Arm] set up a route for Qualcomm to collapse their payments to Arm." Appx8881. Rene Haas, now Arm's chief executive officer, responded that Arm "need[ed] to unwind [the Qualcomm ALA] over time." *Id.* In those executives' view, "the issue here is that Qualcomm already ha[s] that license and in addition, it would be a lot less than we would like to see"; one noted that "novation needs to start at renegotiating the ALA rates" with Qualcomm. Appx5708-5709. Arm's director of commercial strategy and licensing, however, stated that the former "Nuvia team will be able to use the architecture license which Q[u]alcomm has." Appx8723.

The acquisition closed on March 15, 2021, for $1.4 billion. Appx4166. At that time, Nuvia's inchoate design for a server CPU remained a work in progress; it was not yet an "Architecture Compliant Core." Appx5836, 6004. Arm later acknowledged to British regulators that, following the Nuvia acquisition, Qualcomm would "create a proprietary CPU that Qualcomm will keep for itself" through the use of its ALA, which Arm explained "already granted all the

10

rights that architectural licensees need to compete [with Arm]."  Appx8922, 8931 (emphasis omitted).

### D.    Qualcomm's Post-Acquisition CPU Development

After the acquisition closed, the former Nuvia design team became Qualcomm employees.  Appx5846.  Eight days after the closing, Qualcomm's chief executive officer told his counterpart at Arm that Qualcomm would "continue to integrate the [Nuvia] engineers, know-how, and engineering of compliant cores and research into Qualcomm."  Appx8986.

Qualcomm's engineering team then conceived of and started developing new CPUs for the personal-computer, mobile, and automotive markets. Appx5870-5871, 5876-5877.  Those CPUs implemented version 8 of the Arm architecture and were part of a family of CPUs codenamed Phoenix, with the individual CPUs codenamed Hamoa (for personal computers), Pakala (for mobile), and Nordschleife (for automotive).  Appx5870-5871.  Qualcomm also continued Nuvia's work to develop a CPU for server applications.  Appx5874. Qualcomm later began developing a new CPU family, codenamed Pegasus, that implemented version 9 of Arm's architecture.  Appx5872, 5876.  Because each of those new CPU designs targeted different markets, they had different designs, features, and performance.  Appx6144-6145.

Developing a custom CPU is an arduous process, involving years of work by hundreds of specialized engineers.  Appx5872, 5888-5890, 6130-6131.  The

stages of development include determining the design requirements for the target market; writing and revising microarchitecture RTL; and conducting an exhaustive testing process, running millions of tests to discover any technical defects. Appx5872-5877, 5895, 6130-6131, 6145-6146. The CPU also enters a final physical design process, in which a physical CPU is manufactured. Appx5874-5877, 6131. Qualcomm verifies compliance with the Arm architecture and submits the results of its compliance verification to Arm to demonstrate that the CPU executes the Arm instructions properly. Appx5904-5906, 6145-6146. Arm typically issues a sign-off document confirming that the CPU is Arm-compliant. Appx5904-5905, 8945.

Development of Qualcomm's new CPUs began at Qualcomm, and Qualcomm engineers performed all stages of development at Qualcomm. Appx5876-5877; *see* Appx5846, 5872. That extensive development work resulted in distinct microarchitectures for the four CPUs at issue. Appx5870-5877. To develop those CPUs, Qualcomm used some RTL that Nuvia wrote and then made substantial additions and changes to it. Appx5874-5877. In Qualcomm's view, the RTL it acquired from Nuvia constituted "Nuvia Technology" and not "Arm Technology" under the Nuvia ALA, except for the opcodes and register definitions used by Nuvia. Qualcomm generated new RTL for those materials using Qualcomm scripts, replacing all of the opcodes and

register definitions previously downloaded by Nuvia under the Nuvia ALA. Appx5891, 5893-5895, 6153-6156, 9021, 9030.

### E.    Arm's Post-Acquisition Actions

Arm recognized that Qualcomm's shift from off-the-shelf CPUs to custom CPUs would reduce Arm's revenue by hundreds of millions of dollars annually. Appx8786. Given that shift, Arm viewed obtaining a higher royalty rate for Qualcomm's custom cores under the Nuvia ALA as "critical to [its] future revenues." Appx8787. But Richard Grisenthwaite, Arm's chief architect, told colleagues that Qualcomm's ALA was "reasonably bombproof" and "covers everything," and that Arm "has no claim" to any microarchitecture designed by Nuvia, because Arm "can't stop people building a design." *Id.*

Nevertheless, Arm attempted to use the Nuvia acquisition as a means to renegotiate Qualcomm's ALA. Appx9223. The chairman of Arm, who was also SoftBank's chairman, told the rest of Arm's board that Arm "should not be quick to compromise heavy pressure with pricing renegotiation" with Qualcomm. Appx5714-5716. Arm soon began to refer to Qualcomm as the "enemy." Appx8892.

In February 2022, nearly one year after the close of the Nuvia acquisition, Arm terminated the Nuvia ALA, effective March 1, 2022. Appx6883. Section 15.1 of the Nuvia ALA included a provision that, if Arm validly terminated the Nuvia ALA, Nuvia was required "immediately [to] discontinue any use and

13

distribution of all ARM Technology, ARM Confidential Information and any products embodying such technology or information," and "either [to] destroy or [to] return to ARM any ARM Confidential Information, including any copies thereof in its possession and any ARM Technology or derivatives . . . thereof in its possession." Appx6849.

In Arm's view, all of the RTL that Qualcomm acquired from Nuvia constituted a "derivative[]" of "ARM Technology" under Nuvia's ALA and was thus subject to the cessation and destruction requirements of Section 15.1 following termination. Appx6849. Still, Arm provided Qualcomm with a formal sign-off document stating that the server CPU, now finished by Qualcomm, satisfied the verification requirements in the Qualcomm ALA. Appx5905-5907, 6111-6112; *see* Appx8950-8951, 8954. Qualcomm later submitted its verification information for Hamoa, and Arm internally identified the CPU as designed under the "Qualcomm architecture License[]." Appx8978.

Following the release of Qualcomm's Snapdragon chip for the Windows PC market (using the Hamoa CPU), Arm lauded to its shareholders the launch of Microsoft's "first generation of [Co]pilot[+] PCs on Arm." Appx6256-6257. By the end of 2024, Arm projected that it would have more than a 50% market share for Windows CPUs, up from less than 1% in 2013. Appx5691.

14

## II.     PROCEDURAL HISTORY

1.     On August 31, 2022, Arm filed this action against Qualcomm and Nuvia, asserting, as relevant here, claims for breach of Section 15.1 of the Nuvia ALA.  As a remedy for that alleged breach, Arm sought specific performance of that provision, which Arm argued required Qualcomm and Nuvia to destroy Qualcomm's new custom CPUs and any CPUs in development that contained RTL acquired from Nuvia.  Appx0028, 0053-0054.  Qualcomm filed a counterclaim for declaratory judgment, seeking (as relevant here) a declaration that Qualcomm's custom CPUs were fully licensed under the Qualcomm ALA.  Appx0363-0364; *see* Appx0150, 0232.

During discovery, Arm made clear that it was principally seeking specific performance and did not view damages as adequate to remedy its alleged injuries.  *See* Appx5332-5342.  Arm neither produced an expert report nor offered expert testimony setting out any form of monetary harm it suffered, including lost royalties.  And Arm declined to produce any of its ALAs with other licensees showing the royalty rates that those licensees were paying on their custom CPUs.  Appx5258-5259, 5270.

2.     The parties cross-moved for partial summary judgment.  Appx0370-0397, 1214-1246.  Arm argued, as relevant here, that it was entitled to judgment on breach of the Nuvia ALA.  Appx0386-0392.  Qualcomm and Nuvia argued that Arm could not prove the element of harm on its contract claims; that Qualcomm never assumed the Nuvia ALA and thus could not be

15

liable for breach of it; that Nuvia did not breach the Nuvia ALA; and that Qualcomm's CPUs were licensed under the Qualcomm ALA. Appx1220-1240. At the hearing on those motions, the district court asked Arm to identify the harm caused by Qualcomm's purported breach; Arm identified only vague harm to its licensing "[e]cosystem." Appx5037-5039. The court denied both motions for summary judgment.

At the subsequent pretrial conference, Arm's counsel acknowledged that Arm would have to show harm as an element of its breach-of-contract claim and confirmed that "[t]he allegation of harm for purposes of whether there was a breach is that they are using our unlicensed technology and they are not paying for it." Appx5259-5260, 5272-5273. Arm further represented that it was "not arguing that there has been any [e]ffect on any exigent license agreements because the harm hasn't happened yet." Appx5270.

3.    A jury trial was held in December 2024, and the parties agreed that California law governed the contractual issues in the case. *See* Appx0007, 6380. At the beginning of trial, Arm submitted a proffer of the theories of harm on which it planned to rely to prove its breach claim, including that Arm lost royalties because Qualcomm was paying the lower royalty rate under the Qualcomm ALA, rather than the higher royalty rate under the Nuvia ALA. Appx5496-5497. The court asked Arm to identify where it had disclosed during discovery any harm based on such lost royalties, expressing a concern that

16

Arm had "been shifting the playing field." Appx5501. Arm said it would "find that," Appx5501-5502, and the district court ruled that, until it did, Arm could not argue to the jury that the difference in royalty rates between the Qualcomm ALA and the Nuvia ALA proved harm, Appx5507. Arm never followed up with the court.

At trial, Arm argued to the jury that Nuvia had breached Section 15.1 of the Nuvia ALA because Nuvia did not stop using and destroy the pre-acquisition RTL that it had developed under that agreement. *See, e.g.*, Appx6411-6419. Arm further argued that Qualcomm had assumed the Nuvia ALA and was thus liable for breach on the same theory. Appx6419-6422. Three of Arm's executives testified in Arm's case in chief, but none identified a single lost customer, business opportunity, or customer complaint arising from the alleged breach. *See, e.g.*, Appx0018, 6473-6474; *see also* Appx5560, 5618, 5663. Instead, the evidence showed that Arm's revenue had increased significantly since Qualcomm's acquisition of Nuvia. Appx5603-5604, 5688-5689.

Qualcomm and Nuvia argued they had not continued to use "ARM Technology" that Arm claimed was subject to destruction under Section 15.1 of the Nuvia ALA; instead, they had only continued to use RTL acquired from Nuvia, which was "Nuvia Technology" belonging to Nuvia. Appx5858, 5890, 6147, 6250-6251. Qualcomm and Nuvia also showed that the only "ARM Technology" that Arm identified in the RTL acquired from Nuvia were opcodes and

register definitions, which Qualcomm later generated under its own ALA—leaving no "ARM Technology" under the Nuvia ALA present in the RTL. *See* Appx5891-5893, 5988-5989. Qualcomm also presented evidence that it had never assumed the Nuvia ALA. *See* Appx6021.

With respect to Qualcomm's counterclaim, Qualcomm presented extensive evidence that its CPUs containing RTL acquired from Nuvia were licensed under Qualcomm's ALA. Qualcomm's CPU lead and Nuvia's former chief executive officer, Gerard Williams, testified to the extensive process through which Qualcomm designed its new Arm-compatible CPUs. Appx5870-5876; *see* pp. 11-12, *supra*. Qualcomm's evidence showed that the multistage development processes for those CPUs began at Qualcomm after the acquisition. *See*, *e.g.*, Appx5872-5876.

Although an Arm witness testified at trial that Arm understood the Qualcomm ALA not to allow Qualcomm "the ability to use the Nuvia design or its work product," Appx5635, Qualcomm introduced internal Arm communications in which the same witness and others at Arm expressed the contrary view, *see* pp. 10, 13, *supra*. Qualcomm also showed that Arm's actions and internal communications in response to Qualcomm's verification requests revealed Arm's understanding that Qualcomm's custom CPUs had been designed under the Qualcomm ALA. *See* Appx5904-5907, 6111-6112, 8945, 8950-

8951, 8978, 8990-8991. Qualcomm further presented evidence that it had repeatedly informed Arm that it would be using the Qualcomm ALA to develop CPUs post-acquisition. Appx6022-6023, 7115-7116, 8792, 8986.

At the close of evidence, Arm, Qualcomm, and Nuvia all moved for judgment as a matter of law. Appx6326-6334. The district court reserved decision on the motions until after the jury's verdict. *See* Appx6334-6337.

The verdict sheet presented three questions:

1.  Did Arm prove by a preponderance of the evidence that Nuvia breached Section 15.1(a) of the Nuvia ALA?

2.  Did Arm prove by a preponderance of the evidence that Qualcomm breached Section 15.1(a) of the Nuvia ALA?

3.  Did Qualcomm prove by a preponderance of the evidence that the Qualcomm CPUs that include designs acquired in the Nuvia acquisition are licensed under the Qualcomm ALA?

Appx0002. The parties agreed on a jury instruction, based on the California model instructions, that the parties "dispute the meaning of the words in their contract" and that, "[i]n deciding what the words of a contract mean, you must decide what the parties intended at the time the contract was created." Appx0011 (quoting Appx6408); Appx6602-6604. The parties also agreed on a jury instruction stating that, to establish its breach-of-contract claim against either defendant, Arm must show that it "suffered harm." Appx6407.

19

The jury found that Qualcomm did not breach the Nuvia ALA and that Qualcomm's CPUs were licensed under the Qualcomm ALA. Appx0002. The jury did not reach a verdict on whether Nuvia breached the Nuvia ALA. *Id.*

4.    After the verdict, Arm moved for judgment as a matter of law or a new trial. As relevant here, Arm argued that Qualcomm's CPUs were not licensed under the Qualcomm ALA because they included RTL acquired from Nuvia. Appx6642-6647. According to Arm, that meant that the CPUs had not been "designed" or "developed" by Qualcomm within the meaning of the Qualcomm ALA. *Id.* Arm also argued that Nuvia and Qualcomm both breached the Nuvia ALA and that a partial new trial was impermissible because the three issues before the jury were too intertwined. Appx6647-6658. Nuvia also moved for judgment as a matter of law, on the grounds that Nuvia did not breach the Nuvia ALA's termination provision and that Arm presented no evidence of harm. Appx6662-6685. Arm argued that it had shown sufficient proof of harm to its "licensing ecosystem" and because of lost royalties. Appx6728-6729 & n.1. In addition, for the first time, Arm argued that it had "presented sufficient evidence of harm[] based on the breach alone." Appx6727.

The district court denied Arm's motion and granted Nuvia's motion. Appx0021. The court determined that the jury had sufficient evidence to conclude that the CPUs at issue were developed by Qualcomm under the Qualcomm ALA after the Nuvia acquisition. Appx0009-0014. The court rejected

20

Arm's argument that Qualcomm had breached the Nuvia ALA as a matter of law, determining that the jury was entitled to find that Qualcomm did not assume that agreement. Appx0016.

The district court further held that Nuvia was entitled to judgment as a matter of law because Arm had not demonstrated that Nuvia's alleged breach had harmed it. Appx0016-0020. As the court explained, "ARM committed to proving harm throughout this litigation," and it could not "abandon that burden after trial in the face of an adverse jury verdict." Appx0018. The court declined to allow Arm to advance theories of harm that it had not raised until "post-trial briefing" or that would involve a "late-breaking shift in Arm's theory of the case." Appx0017, 0019. With respect to harm to Arm's "licensing ecosystem," the court explained that "ARM presented no trial evidence from third-party market participants suggesting that ARM's licensing ecosystem was negatively impacted by Nuvia's alleged breach of the Nuvia ALA," and that "there was trial evidence to undermine that ARM suffered any adverse consequences at all, such as when ARM's CEO testified that ARM recorded historic licensing and royalty revenues after terminating the Nuvia ALA in 2022." Appx0018.

**SUMMARY OF ARGUMENT**

I.    The district court correctly denied Arm's motion for judgment as a matter of law on Qualcomm's counterclaim, because there was sufficient evidence for the jury to find that Qualcomm's CPUs are licensed under the Qualcomm ALA.

Under the Qualcomm ALA, a CPU is licensed if it is an "Architecture Compliant Core"—a "microprocessor core developed by or for" Qualcomm under its license—and Qualcomm "design[ed]" that core using its rights granted under the ALA.  That contractual language covers the CPUs at issue and does not exclude CPUs that include proprietary RTL acquired from another Arm licensee.

Extrinsic evidence reinforces that meaning.  Ample evidence showed that Arm and Qualcomm understood that Qualcomm's ALA licenses CPUs that included RTL acquired from Nuvia, and the parties' course of dealing reflected that understanding.  Under California law, the district court properly admitted extrinsic evidence to aid in interpreting the contract, and the jury was correctly tasked with resolving conflicts in the evidence.

The jury also saw extensive evidence that Qualcomm developed its CPUs under the terms of the Qualcomm ALA.  CPU development is a highly customized, multistage process.  For each of the CPUs at issue, Qualcomm personnel did that work at Qualcomm after the Nuvia acquisition.

22

Arm now contends that the language of the Qualcomm ALA unambiguously shows that the CPUs were unlicensed, and further contends that the district court erred by denying judgment as a matter of law after the jury verdict. That is incorrect.

The district court correctly recognized that the parties disputed the meaning of the Qualcomm ALA and presented conflicting extrinsic evidence. Under California law, the jury was entitled to resolve those conflicts and interpret the contract. Arm's late-breaking attempt to resist that conclusion ignores that it both opposed summary judgment on the basis of disputed factual issues in the extrinsic evidence and jointly proposed a jury instruction tasking the jury with interpreting the contract.

Even if the meaning of the Qualcomm ALA had been a question for the district court, Arm would still not be entitled to judgment as a matter of law. Arm reads the Qualcomm ALA to mean that a CPU is licensed only where it is designed *solely* "by" or "for" Qualcomm. But Arm must add words to the agreement to reach that interpretation. Arm also contends that any proprietary RTL acquired by Qualcomm from Nuvia was an impermissible use of "ARM technology," an undefined term in the Qualcomm ALA. But Arm offers no reason to conclude that "ARM technology" includes proprietary RTL that

23

Qualcomm obtained when acquiring another Arm licensee. Arm's other arguments fail to overcome the plain meaning of the agreement, and Arm's efforts to distinguish or diminish the extrinsic evidence do not undermine the verdict.

II.    The district court properly granted judgment as a matter of law to Nuvia on Arm's claim for breach of the Nuvia ALA.

Despite accepting from the beginning of this case that it must establish harm to make out a breach-of-contract claim under California law, Arm presented scant evidence of harm. Arm's only preserved theory of harm was harm to Arm's "licensing ecosystem," but Arm presented only evidence of the speculative and unrealized fears of Arm employees that Qualcomm's and Nuvia's alleged breaches might spur other Arm licensees to ignore restrictions in their licensing agreements.

Arm's other two theories of harm—lost royalties and harm from the breach itself—were raised too late. And both theories fail in any event. Arm's support for its lost-royalties theory amounts only to speculation that Qualcomm might have paid a higher rate under the Nuvia ALA—which had been terminated—or for Arm's off-the-shelf cores. And Arm's attempt to equate harm with breach cannot be reconciled with Arm's repeated (and correct) concessions that proof of harm is an independent element of a breach-of-contract claim under California law.

III.    Even if this Court were to hold in Arm's favor on Qualcomm's counterclaim or Arm's claim against Nuvia, a new trial would not be required on the other claims. The discretionary decision whether to grant a full or partial retrial would be best left for the district court on remand. In any event, the claims in this case are sufficiently distinct and separable that there would be no injustice from allowing a partial retrial.

## STANDARD OF REVIEW

This Court conducts de novo review of an order granting or denying a motion for judgment as a matter of law. *See, e.g.*, *Kars 4 Kids Inc.* v. *America Can!*, 8 F.4th 209, 218 n.8 (2021). The Court reviews a district court's decisions regarding discovery and case management for abuse of discretion. *See, e.g.*, *ZF Meritor, LLC* v. *Eaton Corp.*, 696 F.3d 254, 268 (2012).

## ARGUMENT

I.    **THE DISTRICT COURT CORRECTLY DENIED JUDGMENT AS A MATTER OF LAW FOR ARM ON QUALCOMM'S COUNTER-CLAIM**

The jury entered a verdict in Qualcomm's favor on Qualcomm's counterclaim, finding that "Qualcomm['s] CPUs that include designs acquired in the Nuvia acquisition are licensed under the Qualcomm ALA." Appx0002. The jury reasonably reached that conclusion, given the terms of the Qualcomm ALA, the evidence at trial, and settled principles of contract interpretation under California law. Arm's contrary position—that, as a matter of law, the

25

CPUs would be licensed only if the entirety of the underlying RTL were developed solely by or for Qualcomm—is incorrect.

### A. The Jury Permissibly Found That The Qualcomm ALA Covers Qualcomm's Post-Acquisition CPUs

Under California law, "[j]uries are not prohibited from interpreting contracts." *City of Hope National Medical Center* v. *Genentech, Inc.*, 181 P.3d 142, 156 (Cal. 2008). Though unique, the rules under California law governing the roles of the court and the jury in interpreting a written instrument are "well established." *Wolf* v. *Walt Disney Pictures & Television*, 76 Cal. Rptr. 3d 585, 601 (Ct. App. 2008).

When parties dispute the meaning of a contract, a court applying California law engages in an unusual three-step process. *First*, the court provisionally receives extrinsic evidence that is relevant to determining whether the contract is "reasonably susceptible" to each party's proffered interpretation. *Pacific Gas & Electric Co.* v. *G.W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 644 (Cal. 1968). *Second*, the court determines whether the contractual language is "reasonably susceptible" to each party's interpretation in light of the extrinsic evidence; if the language is reasonably susceptible to both interpretations, the court proceeds to admit the extrinsic evidence to aid with interpretation. *Wolf*, 76 Cal. Rptr. 3d at 602. *Third*, the court assesses the extrinsic evidence to determine whether it is in conflict; if it is, the jury is required both to interpret the contract and to apply the correct meaning to the

facts before it. *See City of Hope National Medical Center*, 181 P.3d at 156-157. If the extrinsic evidence is not in conflict, then the court interprets the contract as a matter of law, and the jury must apply that interpretation to the facts found. *See Parsons* v. *Bristol Development Co.*, 402 P.2d 839, 843 (Cal. 1965).

Applying those principles here, the district court correctly denied Arm's motion for judgment as a matter of law on Qualcomm's counterclaim. The relevant contractual language demonstrates that any CPU developed by Qualcomm is licensed under the Qualcomm ALA, regardless of whether it contained some RTL acquired from Nuvia. The relevant extrinsic evidence confirms that conclusion. And the record contained ample evidence that Qualcomm developed its new CPUs under the Qualcomm ALA. The jury was more than entitled to find in Qualcomm's favor.

1.     Annex 1 to the Qualcomm ALA licenses Qualcomm to "use the applicable ARM Technology to design and have designed, including all stages of implementation from specification th[r]ough RTL design to generation of GDSII (subject to Clause 2.2 of the ALA) Architecture Compliant Cores." Appx6935. Annex 1 also grants Qualcomm the right, among other actions, to "manufacture" and "import, sell, supply and distribute" products with Architecture Compliant Cores. *Id.*; *see* Appx6886. Annex 1 defines an Architecture Compliant Core as "a microprocessor core developed by or for LICENSEE

under the licences granted in" Annex 1 and satisfying 10 technical requirements. Appx6932.

Under that language, a CPU is licensed under the Qualcomm ALA if the CPU is "developed by or for" Qualcomm, and Qualcomm "design[ed]" that CPU using the rights granted to it under the Qualcomm ALA. As most relevant here, the word "develop" means "[t]o cause gradually to acquire a specific role, function, or form," *American Heritage Dictionary of the English Language* 495-496 (5th ed. 2018) (*American Heritage*), or "to cause to unfold gradually[;] conduct through a succession of states or changes each of which is preparatory for the next," *Webster's Third New International Dictionary* 618 (2002) (*Webster's*). And the verb "design" means "[t]o formulate a plan for; devise," *American Heritage* 491; or "to plan and plot out the shape and disposition of the parts of and the structural constituents of," *Webster's* 611. The definitions of those terms thus confirm the straightforward meaning of the contractual text.

No provision of the Qualcomm ALA limits the scope of Qualcomm's license where it has acquired a separate Arm licensee and included acquired RTL in a CPU that was started and developed at Qualcomm. Instead, as long as Qualcomm can be said to have "designed" an "Architecture Compliant Core," Qualcomm had the right to use "ARM Technology" in its design. The parties provided in the ALA that such design work would occur in a multistage

28

process beyond RTL development; they even specified that the broad use rights covered "all stages of implementation." Appx6935.

2.    The extrinsic evidence introduced at trial supported the foregoing interpretation. Indeed, Arm's pre-dispute "acts and conduct," including Arm's internal communications, showed that it understood the Qualcomm ALA to license post-acquisition CPUs from Qualcomm that incorporated RTL acquired from Nuvia. *Southern California Edison Co.* v. *Superior Court*, 44 Cal. Rptr. 2d 227, 234 (Ct. App. 1995); *see* Appx6408. After Qualcomm announced the planned acquisition, Arm's director of commercial strategy and licensing acknowledged that the "Nuvia team will be able to use the architecture license which Q[u]alcomm has." Appx8723. Just days after the acquisition closed, Arm's chief architect wrote that Qualcomm "ha[s] a reasonably bombproof arch[itecture] licence that covers everything in the duration (to mid 2020s at least)." Appx8787. An Arm vice president also stated that "[t]he issue here is that Qualcomm already ha[s] that license and in addition, it would be a lot less than we'd like to see," Appx5708; *see* Appx8735, explaining that "we set up a route for Qualcomm to collapse the payments to Arm," Appx8881. And in a submission to British regulators, Arm represented that "Arm has already granted all the rights that architectural licensees need to compete. . . . [T]hey do not need anything further to design their own CPUs." Appx8931 (emphasis omitted).

29

Arm and Qualcomm's interactions were consistent with Arm's internal communications. Shortly after announcing the acquisition, Qualcomm informed Arm that Nuvia's work would be conducted under the Qualcomm ALA. Appx6022-6023, 9334. After the acquisition closed, Arm provided verification sign-off to a Qualcomm CPU that Arm knew contained RTL that Qualcomm acquired from Nuvia, confirming that the CPU satisfied the verification requirements under the Qualcomm ALA. *See* Appx5905-5907, 6111-6112, 8954; *see* p. 14, *supra.* Qualcomm later provided verification information for Hamoa, and Arm personnel again noted internally that the sign-off was "being done [on] account of Qualcomm architecture License[]." Appx8978. In addition, a Qualcomm counsel who was "heavily involved" in the negotiation of the Qualcomm ALA, Appx6011, confirmed that Qualcomm understood the agreement to constitute a "broad architecture license" that ensured "the employees and the work of the employees that came over [from Nuvia] would be covered," Appx6023.

Taken together, that extrinsic evidence confirmed the plain meaning of the Qualcomm ALA: the contract licenses Qualcomm CPUs if Qualcomm designed and developed those CPUs, even where the end product included some Nuvia RTL.

3.    The jury heard substantial evidence that Qualcomm designed the CPUs at issue. Qualcomm's CPU lead (and former Nuvia chief executive officer), Gerard Williams, testified that the "design start point" for the personal-computer CPU (Hamoa) was in July 2021, months after the Nuvia acquisition closed in March 2021, with design for the mobile CPU (Pakala), automotive CPU (Nordschleife), and the next-generation custom CPU (Pegasus) beginning even later. Appx5869, 5874-5876. When asked "what part of th[e] stages" in the "multiphase process" of designing a CPU "took place at Qualcomm," Williams said, "[a]ll of them." Appx5876-5877; *see* pp. 11-12, *supra* (explaining the phases of CPU design). Trial testimony also established that CPU development depended on the CPU's specific market and end use. *See, e.g.*, Appx6130, 6143-6147. As Williams explained, the design aims of the personal-computer, mobile, and automotive CPUs at issue were dramatically different from those of the server CPU being developed by Nuvia before the acquisition. Appx5872-5876, 6238-6240.

Under California law, the jury was entitled to conclude that the CPUs at issue were designed and developed by Qualcomm and thus licensed under the Qualcomm ALA. The district court thus properly denied judgment as a matter of law to Arm on Qualcomm's counterclaim.

### B.    Arm's Contrary Arguments Are Incorrect

Arm contends that the language of the Qualcomm ALA unambiguously supports its view that Qualcomm's CPUs were not licensed.  But the jury was entitled to interpret the contract under California law, and Arm's argument fails on its own terms in any event.

### 1.    Arm's Post-Trial Request For The District Court To Interpret The Qualcomm ALA Was Improper

At trial, the parties disputed the meaning of the Qualcomm ALA and marshaled conflicting extrinsic evidence in support of their respective readings.  Under California law, the jury was entitled to interpret the contract and apply the correct meaning to the facts.  *See City of Hope National Medical Center*, 181 P.3d at 156-157.  The district court correctly determined that Arm jointly proposed to send the question of contract interpretation to the jury and that the record required the jury to interpret the contract in any event.  *See* Appx0009-0014.

a.    Throughout the proceedings below, Arm expressed the view that the proper interpretation of the Qualcomm ALA involved disputed questions of fact.  For example, when opposing Qualcomm's motion for summary judgment on its counterclaim, Arm argued that "genuine disputes of fact" precluded Qualcomm's motion.  Appx3477.  Although Arm included an argument based on the "plain language" of the ALA, it also argued that "the parties' past practice and witness testimony" created "a genuine issue of fact regarding

32

whether Qualcomm's ALA might license Qualcomm to use technology developed under other ALAs." Appx3478-3479. In support of that view, Arm cited extrinsic evidence, including evidence that it would later present at trial. *Compare, e.g.*, Appx3479, *with* Appx5582-5583, 5626-5627, 5759-5760, *and* Br. 22. The district court denied summary judgment, finding "[i]ssues of fact on that clearly." Appx5028; *see* Appx0011.

During trial, Arm moved for judgment as a matter of law on the ground that the Qualcomm ALA unambiguously excluded Qualcomm's CPUs from the scope of the license grant. Appx6329-6331; *see* Fed. R. Civ. P. 50(a). But after the district court reserved judgment on that issue, *see* Appx6334-6337, Arm and Qualcomm *jointly proposed* jury instructions stating that "Arm and defendants dispute the meaning of the words in their contract," and that, "[i]n deciding what the words of a contract mean, you must decide what the parties intended at the time the contract was created," Appx0011 (quoting Appx6408); Appx6602, 6604, 6619-6620. Those instructions reflected California's model instruction on contract interpretation, which applies where "there is conflicting extrinsic evidence as to what the parties intended the language of their contract to mean." Judicial Council of California Civil Jury Instructions § 314, Directions for Use (2024 ed.).

If Arm believed that the jury had no role in the interpretation of the Qualcomm ALA, it had two options. It could have asked the district court to

instruct the jury on what Arm believed was the correct interpretation. Or it could have asked for the jury to make specific findings of historical fact, which the court could have then used to resolve the claim after determining the contract's meaning. But Arm did neither. Instead, it engaged in a heads-I-win-tails-you-lose gambit: if the jury found in Arm's favor, Arm could rely on the jury instructions to argue that the jury adopted its interpretation as a matter of fact; but if the jury found against Arm, Arm could seek a do-over on the ground that its interpretation was correct as a matter of law.

That was improper. Arm's approach was to introduce into the jury instructions what it viewed as a legal error that "would be harmless if the jury found in [its] favor while likely necessitating a new trial if the jury found against [it]." *McCaig* v. *Wells Fargo Bank (Texas), N.A.*, 788 F.3d 463, 476 (5th Cir. 2015). A party cannot invite a district court to instruct the jury in one manner and then argue for the opposite position after trial. *See, e.g., id.*; *Robinson* v. *First State Community Action Agency*, 920 F.3d 182, 189 (3d Cir. 2019); *United States* v. *Ozcelik*, 527 F.3d 88, 97 n.6 (3d Cir. 2008).

Arm now insists (Br. 31) that it would have been "futile" to raise the meaning of the contract at the jury-instruction phase. But Arm does not explain how it could have known that the district court's mind was made up when the court had not even ruled on Arm's motion. *See Cooper Distribution Co.* v. *Amana Refrigeration, Inc.*, 180 F.3d 542, 550 (3d Cir. 1999). After all, if a

34

court does not grant a mid-trial motion for judgment as a matter of law, the motion is not considered denied, but rather deferred for resolution after the verdict. *See* Fed. R. Civ. P. 50(b). Arm provides no reason to conclude that, by declining to rule immediately on Arm's motion, the district court was implicitly signaling that the meaning of the contract presented a question of fact.

Arm's reliance (Br. 29) on cases holding that a court must apply the correct law on post-trial motions misses the point. The problem with Arm's approach at trial was not merely that it failed to object to a proposed jury instruction. *See* Br. 28. It was that, by *jointly proposing* to instruct the jury to determine the meaning of the contract as a matter of fact, Arm induced the district court not to instruct the jury on the meaning that Arm later contended was required as a matter of law.

b.    Arm's litigation conduct aside, the district court properly presented the issue of the Qualcomm ALA's interpretation to the jury. Where the interpretation of a contract's key provisions turns on "credibility" assessments, a court applying California law must "submit[] the construction of the contract to the jury." *Warner Construction Corp.* v. *City of Los Angeles*, 466 P.2d 996, 997 (Cal. 1970).

Here, the parties presented conflicting testimony and evidence to support their readings of the Qualcomm ALA. As already explained, Qualcomm

35

presented extrinsic evidence at trial that both it and Arm understood the license grant in the Qualcomm ALA to cover Arm-compatible CPUs that Qualcomm designed but that incorporated some design work completed by Nuvia before the acquisition. *See* pp. 18-19, *supra.* Arm's witnesses offered contrary testimony. *See* Appx0010-0014.

For example, an Arm vice president testified that Arm's position was that "the Qualcomm ALA wouldn't allow them the ability to use the Nuvia design or its work product." Appx5635. Arm's chief executive officer testified that, "at the end, it's an Arm compliant processor, and what that means is the intellectual property and the confidential information that belongs to Arm is inextricably linked with the ideas of the customer." Appx5671. And although Arm's chief architect stated in response to the Nuvia acquisition that Qualcomm had a "reasonably bombproof arch[itecture] licence that covers everything," Appx8787, he attempted to explain that comment as merely "referring to the fact that the license covered v8 and v8 next," Appx6105. As the district court also noted, Appx0010, Arm elicited a concession from a Qualcomm witness that Nuvia's pre-acquisition work was not "being done by or for" Qualcomm, Appx6032.

The interpretation of the contract thus "turned on an assessment of conflicting evidence extrinsic to the language" of the contract and on "the credibility of the opposing witnesses." *Morey* v. *Vannucci*, 75 Cal. Rptr. 2d 573,

580 (Ct. App. 1998).  Resolution of those issues was properly submitted to the jury—as Arm itself proposed.

### 2. *Even If The Meaning Of The Qualcomm ALA Was A Question For The District Court, Arm Would Still Not Prevail*

Even if the meaning of the Qualcomm ALA were a question for the district court, Arm would not have been entitled to judgment as a matter of law.

a.    As an initial matter, the language of the Qualcomm ALA does not support Arm's interpretation—and certainly does not show that the agreement is "reasonably susceptible" only to that interpretation. *Pacific Gas & Electric*, 442 P.2d at 644.

i.    The license grant in the Qualcomm ALA states that Qualcomm is licensed to "use the applicable ARM Technology to design and have designed, including all stages of implementation from specification th[r]ough RTL design to generation of GDSII (subject to Clause 2.2 of the ALA) Architecture Compliant Cores."  Appx6935.  Arm argues that, because an "Architecture Compliant Core" is defined as a microprocessor core "developed by or for" Qualcomm under the Qualcomm ALA, *every aspect* of the development of a CPU must have been done either by Qualcomm or by a third party acting under the Qualcomm ALA.  Br. 20, 24-25.

That violates the "fundamental principle" that courts are "not to insert what has been omitted" from a contract. *Safeco Insurance Co.* v. *Robert S.*, 28

P.3d 889, 893 (Cal. 2001); Cal. Civ. Proc. Code § 1858. Arm's reading requires defining an Architecture Compliant Core developed "by or for" Qualcomm to mean a CPU developed "only" or "solely" by (or for) Qualcomm. Br. 5, 20, 24. But that is not what the ALA says.

Arm's argument also rests on the flawed premise that "what matters is not when the *cores* were designed, but when and under which ALA the *code* in those cores was designed." Br. 27. Qualcomm's counterclaim has always been about whether Qualcomm's completed *CPUs* were licensed, not whether Qualcomm was authorized to use *RTL acquired from Nuvia*. Arm itself accepted a verdict form asking the jury to resolve that question. Appx0002; *see* Appx6390-6395. The ALA also shows Arm's error: it grants a license to Qualcomm to use ARM Technology to design and develop "Architecture Compliant Cores"—not RTL—at "all stages of implementation," and it specifies that those stages are not limited to "RTL design" but instead range from "specification" to "generation of GDSII" (a file produced to send a design to factories for manufacturing the completed microprocessor). Appx6935; *see* Appx6311-6312. The unrefuted evidence showed that Qualcomm performed every stage of design and development listed in the ALA, and Qualcomm's extensive development resulted in a CPU that met the technical contractual requirements for an "Architecture Compliant Core." *See* pp. 11-12, 31, *supra*.

38

ii.    Arm also raises (Br. 20, 29-30) the language in the Qualcomm ALA that "[i]n no event shall the licenses granted" in that agreement "be construed as granting" Qualcomm "a license to use any ARM technology except the ARM Technology."  Appx6891.  Arm argues that Qualcomm thus cannot use any ARM technology except the "ARM Technology" as that phrase is contractually defined, and that RTL "delivered by" another Arm licensee to Qualcomm constitutes "ARM technology" and not "ARM Technology."  Br. 20.

To put it mildly, that is a complicated argument.  But it fails because Arm does not identify any basis for concluding that RTL acquired by Qualcomm from Nuvia constitutes "ARM technology"—an undefined phrase in a contract to which Nuvia is not even a party.  There is no textual or logical reason to conclude that RTL acquired from Nuvia constitutes "ARM technology" when Arm did nothing to create it and does not own it.

Arm also contends that, because the Qualcomm ALA states that "ARM Technology" (the contractually defined phrase) is "delivered by ARM or a Controlling Party to [Qualcomm] under this ALA," then any "ARM technology" (the undefined phrase) "delivered by" Arm to another licensee would be unlicensed. Br. 20.  That argument again assumes its conclusion:  that "ARM technology" includes RTL acquired from another licensee.  In addition, Arm's argument relies on an inoperative definition of "ARM Technology":  the definition of that phrase in Annex 1, whose terms control in the event of a conflict

39

with the main ALA, omits the language stating that ARM Technology is "delivered by" Arm. Appx6932.

iii.    Arm next focuses on the phrase "including all stages of implementation" in the license grant. Arm argues that the phrase modifies only the phrase "have designed" and thus cannot support Qualcomm's interpretation, because the RTL acquired from Nuvia was "designed for Nuvia alone." Br. 26. Arm further argues (Br. 25-26) that the license grant's reference to Section 2.2, the Qualcomm ALA's designer-collaboration provision, shows that Qualcomm is allowed to rely only on design work commissioned under that section.

That argument is unpersuasive for two reasons. *First*, the scope of Qualcomm's "have designed" right is irrelevant here. Qualcomm is not claiming to have engaged Nuvia as a design collaborator under Section 2.2; Qualcomm is arguing instead that it "designed" the post-acquisition CPUs itself. *Second*, it is a "conventional rule[] of grammar" that, "[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series, a modifier at the end of the list normally applies to the entire series." *Facebook, Inc.* v. *Duguid*, 592 U.S. 395, 402 (2021) (internal quotation marks and citation omitted). That rule counsels that the phrase "all stages of implementation" modifies *both* verbs in the series "design or have designed," such that Qualcomm may *itself* perform design work on its CPUs at "all stages of implementation."

As for the reference to Section 2.2, it can grammatically apply to both the "design" and "have designed" rights; it just would not impose any limitations where no designer collaboration occurred.

iv.    Finally with respect to the contractual text, Arm argues that its reading avoids an "'absurd' and 'inequitable' result[]" in which Qualcomm's license would extend to products where Qualcomm performed only 1% of a CPU's development while 99% was performed by another party under a different Arm license. Br. 26-27. But Qualcomm's position is only that the license covers products that Qualcomm can be said to have "designed" and "developed," and the question whether a particular product satisfies that standard is a mixed question of law and fact for resolution by the jury. *See Hana Financial, Inc.* v. *Hana Bank*, 574 U.S. 418, 423-424 (2015). The jury resolved that question in Qualcomm's favor.

If anything, it is Arm's interpretation that would produce absurd results. Under Arm's view, as long as *any* minute portion of the development of a Qualcomm CPU was done by an acquired entity, then the CPU would not be licensed. The text of the Qualcomm ALA does not support such an odd result, particularly where the evidence at trial showed that all of the CPUs in question were conceived at Qualcomm and that Qualcomm performed all of the steps to design them.

41

b.      As explained above, the extrinsic evidence tilted decidedly in Qualcomm's favor as well. *See* pp. 29-30, *supra*.

Faced with extensive evidence that its executives and employees read the Qualcomm ALA consistent with the verdict, Arm attempts to exclude those communications from consideration as "uncommunicated subjective intent." Br. 33. But "[t]he practical interpretation of the contract by one party, evidenced by his words or acts, can be used against him on behalf of the other party." *Southern California Edison*, 44 Cal. Rptr. 2d at 234.

Arm also disputes (Br. 33 n.3) the import of those communications by arguing that, in "context," the discussions concerned RTL developed by former Nuvia employees *after* the acquisition. Tellingly, neither Arm nor its witnesses said at trial that those discussions concerned only such post-acquisition work. *See* Appx5640-5642, 5644-5646, 5698-5704, 5758-5760, 6105-6107. Regardless, any conflict among the communications was for the jury to resolve, *see Morey*, 75 Cal. Rptr. 2d at 580, and it did so in favor of Qualcomm.

Arm further asserts that correspondence between Arm and Qualcomm after the acquisition was announced showed that "Qualcomm knew it needed Arm's 'consent'" to acquire Nuvia and use any acquired RTL. Br. 34. But that correspondence concerns Arm's position concerning the effect of the Nuvia ALA, not the independent question whether Qualcomm's CPUs would be li-

42

censed under the Qualcomm ALA after incorporating RTL acquired from Nuvia. Appx7117. At most, Arm's argument merely underscores a conflict in the evidence about the license under the Qualcomm ALA, which the jury was entitled to resolve. *Morey*, 75 Cal. Rptr. 2d at 580.

In short, Arm's arguments on the extrinsic evidence only highlight its disputes about that evidence. Given those conflicts, the district court correctly submitted the issue of contract interpretation to the jury, and the jury properly found that Qualcomm's evidence more credibly reflected the parties' intent. Arm has identified no valid basis to disrupt the jury's verdict—or the judgment on Qualcomm's counterclaim.

## II.    THE DISTRICT COURT PROPERLY GRANTED JUDGMENT AS A MATTER OF LAW FOR NUVIA ON ARM'S CLAIM FOR BREACH OF THE NUVIA ALA

The district court correctly granted judgment as a matter of law to Nuvia on the ground that Arm failed to prove the harm element of its claim for breach of the Nuvia ALA. Arm's contrary arguments lack merit.

### A.    Arm Failed To Present Sufficient Evidence Of Harm From Nuvia's Alleged Breach Of Contract

Arm does not dispute that it was required to prove harm in order to prevail on a breach-of-contract claim under California law. *See* Appx5150; *Darbun Enterprises, Inc.* v. *San Fernando Community Hospital*, 191 Cal. Rptr. 3d 340, 348 (Ct. App. 2015). The parties agreed to instruct the jury that Arm

43

was required to prove that Nuvia's alleged breach of the Nuvia ALA caused "Arm [to] suffer[] harm." Appx6407, 6619. To satisfy that requirement, Arm needed to demonstrate "appreciable and actual" harm from the breach; claims of "speculative" harm were insufficient. *Aguilera* v. *Pirelli Armstrong Tire Corp.*, 223 F.3d 1010, 1015 (9th Cir. 2000) (citation omitted).

At trial, however, Arm did not show that Nuvia's alleged breach caused or would cause any appreciable harm. None of Arm's witnesses identified a single lost customer, a single lost business opportunity, or even a single customer complaint arising from Nuvia's alleged breach. To the contrary, Arm's chief executive officer confirmed that, as of the time of trial, Arm had not suffered any concrete harm. Appx5683-5685. Unrebutted evidence showed that Arm posted record licensing and royalty revenues after terminating the Nuvia ALA. Appx5686-5689, 9063-9084, 9338-9351.

## B.    Arm's Proffered Theories Of Harm Lack Merit

Arm now advances three theories of harm that it claims were supported by the trial record. Arm presented only the first at trial, and each is erroneous in any event.

### 1.    *Licensing Ecosystem*

Arm argues (Br. 43-47) that the record demonstrated that it suffered harm to its "licensing ecosystem." More specifically, Arm contends that, by "putting unlicensed technology into the market," Nuvia created a "signal[]"

44

for other Arm licensees that Arm's licensing agreements "may be breached without consequence." Br. 43-44. That argument falters.

As an initial matter, Arm is conflating its breach-of-contract claims against Nuvia and Qualcomm. The claim at issue here is Arm's claim against *Nuvia*. But Arm's theory of harm to its licensing ecosystem depends on *Qualcomm's* marketing of chips years after the Nuvia acquisition. Arm did not show that any purported harm to its licensing ecosystem was attributable to Nuvia—which ceased to function as an independent company after the acquisition, *see* pp. 9-10, *supra*—as opposed to Qualcomm's independent actions to bring its chips with Arm-compatible CPUs to market.

In any event, the testimony cited by Arm (Br. 44) showed only that Arm employees *feared* that the release of Qualcomm's products would spur other licensees to disregard limitations in Arm's license agreements. As the district court observed, Arm presented no evidence from third-party market participants suggesting that Arm's licensing ecosystem was harmed, or would be harmed, by Nuvia's alleged breach. *See* Appx0018. Notably, Arm's licensees knew about the alleged breach only because Arm sent letters to certain Qualcomm customers informing them of the litigation. *See* Appx5731-5733, 9368-9378. Absent any proof of appreciable harm, a jury had only insufficient "speculative" harm to rely on. *Aguilera*, 223 F.3d at 1015.

The two non-precedential trial-court decisions cited by Arm (Br. 44) do not demonstrate otherwise. In *DVD Copy Control Association, Inc.* v. *Kaleidescape, Inc.*, Civ. No. 1-04-31829, 2012 WL 12987159 (Cal. Super. Ct. Jan. 9, 2012), the plaintiff introduced evidence, including from an expert economist, that a breach would make it harder for the plaintiff to enforce its licensing agreement in the future. *See id.* at \*26-\*27. And in *Artifex Software, Inc.* v. *Hancom, Inc.*, Civ. No. 16-6982, 2017 WL 1477373 (N.D. Cal. Apr. 25, 2017), the court did not discuss harm from the risk of future actors disregarding a licensing agreement; it considered harm from the loss of a licensing fee and economic benefits of open-source sharing. *See id.* at \*3.

Arm also faults the district court for requiring "some hypothetically stronger piece of evidence" than what Arm presented through its witness testimony. Br. 45. But the court merely required Arm to offer sufficient evidence for a reasonable jury to find by a preponderance of the evidence that Arm had suffered or would suffer actual harm from the alleged breach. And all Arm offered were speculative fears that such harm might occur.

Arm separately suggests (Br. 45-46) that the district court erred by citing the jury's finding on the Qualcomm ALA in support of its determination that Arm failed to prove harm. The district court made that brief observation in a single sentence after explaining the lopsided nature of the record on this score. *See* Appx0019. It thus hardly provides a basis for reversal.

### 2.    *Lost Royalties*

Arm also argues (Br. 36-43) that Nuvia's alleged breach caused it to receive lower royalties from Qualcomm than it otherwise would have. The district court correctly rejected that theory.

a.    As the district court explained, Arm failed to disclose before trial that it intended to argue a lost-royalties theory of harm. *See* Appx0019. Throughout the proceedings below, Arm sought only the destruction of Qualcomm's CPUs as a form of specific performance. Had Arm argued that it suffered harm in the form of lost royalties, it would have had an adequate remedy at law precluding specific performance. *See, e.g.*, *Wilkison* v. *Wiederkehr*, 124 Cal. Rptr. 2d 631, 640-641 (Ct. App. 2002). Unsurprisingly, Arm disclaimed that it was seeking damages, did not offer any measurement of its lost royalties, and did not present an expert on lost royalties. *See* Appx5037-5039, 5260-5262. In addition, throughout discovery, Arm refused to produce unredacted ALAs with other Arm licensees that would have shown the royalty rates paid by those parties. Appx5270.

After Arm informed Qualcomm on the eve of trial that it intended to prove harm in the form of lost royalties, the district court instructed Arm to show that it had timely disclosed that theory of harm. Appx5500-5501. In the court's view, Arm had been "shifting the playing field" by switching from claiming that "money won't suffice" to now claiming that it sought "higher

47

[royalty] rates." Appx5501-5502. But Arm never followed up with such proof. *See* Appx5502-5503.

Arm now asserts that it "reasonably understood this instruction to be mooted by Nuvia's failure to object at trial to any royalties evidence, its failure to ask for a limiting instruction, and its own introduction of this evidence." Br. 41-42. Arm omits to mention that the parties agreed that royalty-related evidence could come in at trial *for other purposes*, such as to show Arm's desire to increase profits. *See, e.g.*, Appx5118-5121. It is hard to credit the notion that Arm was somehow confused into thinking that, despite the district court's ruling, it was entitled to use royalties-related evidence to prove harm.

Arm also argues (Br. 43) that the district court abused its discretion in invoking Federal Rule of Civil Procedure 37(c) to bar it from presenting the lost-royalties theory. That is incorrect. The district court fully explained why allowing that theory of harm was neither "substantially justified" nor "harmless." Fed. R. Civ. P. 37(c). The court gave Arm the opportunity to show where it had disclosed the theory before trial, but Arm waited until "after trial" to attempt to "show that it had disclosed its royalty theory during discovery." Appx0019. "Allowing such a dramatic late-breaking shift in ARM's theory of the case would have been highly prejudicial to [d]efendants," which did not prepare to dispute the notion that the alleged breach reduced Arm's receipt of royalties. Appx0019-0020. There was no abuse of discretion.

48

Arm further contends (Br. 40-42) that it preserved its lost-royalties theory at various points in the record. But Arm strips its prior statements of context. For example, Arm quotes an expert report stating that, "if Qualcomm could acquire Nuvia, [and] repurpose Nuvia's development work under the ALA for a different purpose," it could "then commercialize that work under Qualcomm's own lower royalty rates." Br. 41 (quoting Appx2109; brackets and emphasis omitted). But Arm omits to mention that the statement was used to support harm to Arm's licensing ecosystem, not lost royalties. *See* Appx2109. Notably, Arm did not call that expert to testify at trial.

Arm further asserts (Br. 38) that the district court effectively imposed a retroactive limiting instruction on the jury's consideration of its royalty evidence. The court did no such thing. Rather, it simply applied the Rule 50 standard to hold that, because Arm was forbidden from presenting its lost-royalties theory, the theory could not support a jury verdict for Arm on the element of harm.

b.    Even if Arm had preserved its lost-royalties theory, it would not have sufficed.

Arm's principal theory (Br. 36) is that, in the absence of the alleged breach, Qualcomm might have paid the higher royalty rates under the Nuvia ALA. But that theory never made sense. Arm is alleging that Nuvia breached a purported obligation to destroy the RTL that Nuvia developed before the

49

acquisition. *See* Appx0043-0045. The purported lost royalties, however, arose from Qualcomm's sales, not Nuvia's. Arm is mixing apples and oranges by seeking to prove harm caused by Nuvia based on Qualcomm's conduct. *See* p. 45, *supra.* Further, the alleged destruction obligation only arose after the Nuvia ALA was terminated. Arm fails to explain why Qualcomm would have paid higher royalty rates under the Nuvia ALA when the alleged breach arose from a termination duty.

Arm also speculates that, if Nuvia had destroyed its pre-acquisition RTL, Qualcomm would have needed to use more off-the-shelf Arm CPUs, which incurred a higher royalty rate under the Qualcomm TLA. Br. 36. But the evidence that Arm cites (Br. 36-37) showed only that, *if* Qualcomm had continued to use off-the-shelf CPUs, the royalties it paid would have been higher. Arm presented no evidence, and asked Qualcomm's witnesses no questions, about how Qualcomm would have proceeded if Nuvia had destroyed the RTL it previously developed. Arm's position is thus based on speculation, and there is no evidence from which a reasonable jury could find that Arm would have received greater royalties absent Nuvia's alleged breach. *See Ambrose* v. *Township of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002).

### 3.   *Harm From The Alleged Breach Itself*

Arm finally argues (Br. 47-48) that it suffered harm from the breach of Nuvia ALA alone. The district court correctly rejected that argument, too.

50

Under Arm's argument, harm is not an independent element of a breach-of-contract claim under California law, either because proof of breach alone proves liability, or because proof of breach also proves harm, which in turn proves liability. But as the district court correctly recognized, that is an about-face from Arm's previous litigation conduct. At every step of the case until the adverse verdict, Arm acknowledged that harm is an independent element of a breach-of-contract claim under California law. *See* Appx0395, 3467-3470 (summary judgment); Appx5143, 5148-5150, 5221-5222 (pretrial statements); Appx6600 (joint proposed jury instructions); Appx6324 (mid-trial colloquy regarding jury instructions); Appx6329, 6333-6334 (motion for judgment as a matter of law); Appx6510 (closing argument).

In light of that pre-verdict conduct, Arm cannot seriously contend that harm was not an independent element of its contract claim. And Arm's conduct makes good sense, because even a party seeking specific performance under California law must "prov[e] the elements of a standard breach of contract." *Darbun Enterprises*, 191 Cal. Rptr. 3d at 348. To be sure, California law allows courts to consider various forms of harm when the plaintiff seeks specific performance. *See* Arm Br. 47. But a plaintiff still must prove *some* form of harm. The cases on which Arm relies (Br. 47-48) discuss either nominal damages (which Arm does not pursue) or the absence of a need to show damages when seeking specific performance. Arm's belated effort to avoid

51

proving the element of harm on its contract claim against Nuvia thus falls short.[*]

## III.    A NEW TRIAL ON ALL CLAIMS IS NOT WARRANTED IF ARM PREVAILS ON EITHER OF ITS ARGUMENTS ON APPEAL

Arm argues that, if this Court reverses on either Qualcomm's counterclaim or Arm's breach-of-contract claim against Nuvia, it should order a new trial on all claims.  As explained above, this Court should affirm in full.  But even if it reverses in part, it should not order a new trial on all claims.

1.    As a preliminary matter, if the Court reverses in part, it should remand the case to allow the district court to decide in the first instance whether a new trial is necessary.  The decision to grant a full or partial new trial falls within the district court's "sound exercise of discretion," *Vizzini* v. *Ford Motor Co.*, 569 F.2d 754, 760 (3d Cir. 1977), which this Court reviews for abuse of discretion, *see, e.g.*, *Armstrong* v. *Burdette Tomlin Memorial Hospital*, 438 F.3d 240, 253 (3d Cir. 2006).  But the district court never exercised its discretion to decide whether a partial or full retrial was warranted, because it entered judgment in full for defendants.  If this Court were to reverse only on

---

[*] Separately, Arm argues (Br. 48-51) that a reasonable jury could have found that Nuvia breached the Nuvia ALA.  The district court did not decide whether Nuvia was entitled to judgment as a matter of law based on the failure to prove breach, and Nuvia is not raising that argument as an alternative ground for affirmance.  There is thus no basis for the Court to address that issue.

Arm's claim against Nuvia, a remand would be required in any event for the district court to address Nuvia's additional argument for judgment as a matter of law on the element of breach. *See* p. 52 n.\*, *supra*. So considered, the appropriate course if the Court were to reverse on either issue would be to remand for the district court to decide whether to order a new trial.

2.    On the merits, Arm is incorrect (Br. 54-57) that vacatur of the judgment on its claim against Nuvia would require a new trial on Arm's claim against Qualcomm and on Qualcomm's counterclaim. A district court has discretion to order a partial new trial where the issue being retried is sufficiently "distinct and separable" that a partial retrial "may be had without injustice." *Armstrong*, 438 F.3d at 253. That is the case here.

a.    Arm has not identified any injustice from having to retry its claim against Nuvia without retrying its breach-of-contract claim against Qualcomm or Qualcomm's counterclaim. In the proceedings below, Nuvia agreed that, if the claim against Nuvia is tried alone, Nuvia would not raise any issues of preclusion—or even raise the adverse verdicts—in any retrial. Appx6709-6710. Nor does Arm identify any trial error concerning its claim against Nuvia that could have prejudiced Arm's case against Qualcomm and on Qualcomm's counterclaim. Instead, a new trial on the claim against Nuvia would be required simply because the jury did not reach a verdict on that claim. Appx0002, 0007.

In any event, the claims are sufficiently distinct and separable that no injustice would result from a partial retrial even absent Nuvia's agreement. The claims against Nuvia and Qualcomm for breach of the Nuvia ALA involved separate parties as well as different legal theories, defenses, and evidence. Most importantly, the jury was instructed on Qualcomm's defense that it did not assume the Nuvia ALA, Appx6406-6407, 6419-6422, and Arm does not contend on appeal that the jury lacked sufficient evidence to find in Qualcomm's favor on that defense. Qualcomm's defense thus readily explains the jury's verdict in Qualcomm's favor on that claim despite its inability to reach a verdict on Nuvia's liability.

Arm argues that, because there are some overlapping factual issues in its claims against Nuvia and Qualcomm, it is "impossible to conclude with the requisite certainty" that the claims are "distinct and separable." Br. 55-56. But Arm fails to mention that a partial retrial must also result in "injustice" to one of the parties. *Armstrong*, 438 F.3d at 253. Arm has not explained how a partial retrial of its claim against Nuvia imparts injustice.

Arm also suggests that a problem would arise because "separating these claims would require one jury to impermissibly re-examine the same factual issues" and "would pose a real risk of inconsistent verdicts." Br. 56. There are two problems with that argument. *First*, the right to avoid re-examination of jury verdicts is "the *verdict winner's* constitutional right," *Whelan* v. *Abell*,

54

48 F.3d 1247, 1252 (D.C. Cir. 1995) (emphasis added), in that it protects the prevailing party from having another jury second-guess the favorable verdict the party already obtained. Because the jury found in Qualcomm's favor on both its counterclaim and on Arm's breach claim, Qualcomm, and not Arm, would suffer prejudice from any re-examination of the facts found by the first jury. *Second*, and again, a verdict for Arm on retrial of Nuvia's liability could easily be reconciled with the verdict on Qualcomm's liability on the ground that the first jury found for Qualcomm on the issue of assumption.

This Court's precedents cited by Arm (Br. 54-56) are not to the contrary. Both *Spence* v. *Board of Education of Christina School District*, 806 F.2d 1198, 1202 (1986), and *Williams* v. *Rene*, 72 F.3d 1096, 1101 (1995), involved the question whether damages can be tried separately from liability, which is not at issue here. And in *American Home Assurance Co.* v. *Sunshine Supermarket, Inc.*, 753 F.2d 321, 329 (1985), the Court merely made a fact-specific holding that a full new trial was necessary based on the nature of the particular questions to be retried. The same is true of the other authorities cited by Arm. *See* Br. 55-56.

b.     Qualcomm's counterclaim under the Qualcomm ALA is also separable from Arm's breach-of-contract claim against Nuvia. As Arm previously argued, those claims involve different parties, "unrelated, independent" contracts, and different allegations. Appx6640. Arm's counsel also argued at trial

that the Qualcomm "agreement doesn't have anything to do with what Nuvia was allowed to do," and that the "Qualcomm license" is "irrelevant" to "the Nuvia agreement." Appx5530-5531, 6423. Indeed, Arm continues to maintain on appeal that "[t]he Nuvia and Qualcomm ALAs are distinct contracts that impose distinct legal obligations and whose breach gives rise to distinct claims for relief." Br. 46 (internal quotation marks, citation, and alterations omitted). Arm's contrary suggestion (Br. 56-57) that the claims are too intertwined to be retried separately thus falls flat.

3.     Arm additionally argues (Br. 52-54) that reversal or vacatur of the judgment for Qualcomm on Qualcomm's counterclaim would require a new trial of both of Arm's breach claims. Of course, if the Court were to affirm the entry of judgment as a matter of law for Nuvia, no new trial would be necessary on that issue. *Cf.* Arm Br. 54 n.5. In any event, Qualcomm's and Nuvia's liability for breach of the Nuvia ALA are not so intertwined with Qualcomm's counterclaim that a new trial on those claims would be necessary.

Arm argues (Br. 53) that the district court "blended" those issues in its post-trial opinion. But the district court mentioned the jury's verdict on Qualcomm's counterclaim only to bolster the conclusion it had already reached on the breach-of-contract claim against Nuvia. *See* Appx0018-0019. Contrary to

56

Arm's suggestion (Br. 53), the district court nowhere relied on the jury's verdict on Qualcomm's counterclaim when declining to grant judgment as a matter of law on Arm's claim against Qualcomm. *See* Appx0014-0016.

Finally, Arm contends that a full new trial is needed because "[b]oth before and during trial, defendants characterized the Qualcomm ALA as a complete defense to both of Arm's breach claims." Br. 53 (citing Appx5396, 5539-5540, 5554, 5558, 6450, 6464, 6470-6471, 7118-7120). But defendants only twice mentioned that point in passing before the jury. *See* Appx5558, 6470. And the jury was not instructed that a finding for Qualcomm on its counterclaim would preclude liability against Qualcomm on Arm's claim. *See* Appx6406-6408. Instead, the jury was instructed that Qualcomm's liability depended on the questions of whether Qualcomm intentionally assumed any of Nuvia's obligations under the Nuvia ALA, and whether Qualcomm failed to do something that the Nuvia ALA required. Appx6407. Because jurors are presumed to follow jury instructions faithfully, *see O'Brien* v. *Middle East Forum*, 57 F.4th 110, 122 (3d Cir. 2023), there is no basis to infer that two brief comments from defense counsel at trial affected the jury's verdicts.

57

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

/s/ Kannon K. Shanmugam

KAREN L. DUNN
WILLIAM A. ISAACSON
DUNN ISAACSON RHEE LLP
  401 Ninth Street, N.W.
  Washington, DC 20004

ERIN J. MORGAN
DUNN ISAACSON RHEE LLP
  11 Park Place
  New York, NY 10007

KANNON K. SHANMUGAM
MASHA HANSFORD
WILLIAM T. MARKS
JAMES DURLING
MATTHEW J. DISLER
AUSTIN W. PIATT
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  2001 K Street, N.W.
  Washington, DC 20006
  (202) 223-7300
  kshanmugam@paulweiss.com

CATHERINE NYARADY
JACOB A. BRALY
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  1285 Avenue of the Americas
  New York, NY 10019

APRIL 20, 2026

58

## CERTIFICATE OF BAR MEMBERSHIP

I, Kannon K. Shanmugam, counsel for appellees Qualcomm Incorporated, Qualcomm Technologies, Inc., and Nuvia, Inc., hereby certify, pursuant to Third Circuit Rules 28.3(d) and 46.1(e), that I am a member in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

APRIL 20, 2026

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I hereby certify that:

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,718 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font.

3.      This brief complies with the electronic filing requirements of Third Circuit Rule 31.1(c) because the text of the electronic copy of this brief filed using this Court's electronic-filing system is identical to the text in the paper copies filed with the Clerk, and the electronic copy was scanned for viruses using Symantec Endpoint Protection and no viruses were detected.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

## CERTIFICATE OF SERVICE

I, Kannon K. Shanmugam, counsel for appellees Qualcomm Incorporated, Qualcomm Technologies, Inc., and Nuvia, Inc., and a member of the Bar of this Court, hereby certify that, on April 20, 2026, an electronic copy of this brief was filed with the Clerk using the Court's electronic-filing system.  I further certify that all parties required to be served have been served.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM