**No. 25-2923**

# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

ARM LTD., *Plaintiff-Appellant*,

v.

QUALCOMM INC., QUALCOMM TECHNOLOGIES, INC., NUVIA, INC., *Defendants-Appellees*.

Appeal from the U.S. District Court for the District of Delaware, No. 1:22-cv-01146, Hon. Maryellen Noreika

## REPLY BRIEF FOR PLAINTIFF-APPELLANT ARM LTD.

GREGG F. LOCASCIO
JASON M. WILCOX
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004

SCOTT F. LLEWELLYN
MORRISON & FOERSTER LLP
370 17th Street, 4200 Republic Plaza
Denver, CO 80202

ALEXANDRA M. AVVOCATO
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019

JOSEPH R. PALMORE
ALISON H. HUNG
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
(202) 887-6940
jpalmore@mofo.com

ERIK J. OLSON
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304

*Counsel for Plaintiff-Appellant Arm Ltd.*

JULY 10, 2026

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit LAR 26.1, Arm Ltd. makes the following disclosure:

1. For non-governmental corporate parties, please list all parent corporations:

Arm Holdings plc

2. For non-governmental corporate parties, please list all publicly held companies that hold 10% or more of the party's stock:

Arm Ltd. is 100% owned by Arm Holdings plc.

3. If there is a publicly held corporation which is not a party to the proceeding before this Court but which has a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

Arm Holdings plc is publicly held and owns 100% of Arm Ltd. Softbank Group Corp. beneficially owns approximately 87% of the total issued and outstanding share capital of Arm Holdings plc.

4. In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and 3) any entity not named in the caption which is an active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

N/A

Dated:  July 10, 2026

/s/ Joseph R. Palmore
Joseph R. Palmore

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ...........................................................i

TABLE OF AUTHORITIES .............................................................................iv

INTRODUCTION ...........................................................................................1

ARGUMENT .................................................................................................2

I.  THE DISTRICT COURT ERRED IN DENYING ARM JUDGMENT ON WHETHER QUALCOMM'S ALA COVERS CORES CONTAINING PRE-ACQUISITION NUVIA CODE...................................2

    A.  Qualcomm Attempts To Rewrite The Qualcomm ALA's Unambiguous Text .................................................................3

    B.  None Of The Extrinsic Evidence Qualcomm Cites Turns The Meaning Of The Qualcomm ALA Into A Factual Issue Or Supports Qualcomm's Atextual Reading................................9

    C.  None Of Arm's Litigation Conduct Erased The Need For The District Court To Apply Correct Law And Interpret The Qualcomm ALA ...........................................................13

II. THE DISTRICT COURT ERRED IN GRANTING JUDGMENT FOR NUVIA ON HARM.......................................................................15

    A.  A Reasonable Jury Could Have Found Arm Lost Royalties Because Of Nuvia's Breach .................................................16

        1.  Both parties introduced more than sufficient evidence that Nuvia's breach caused Arm to lose royalties...........................16

        2.  The district court wrongly limited use of Arm's royalties evidence despite never precluding the jury from considering such evidence for harm ...........................18

        3.  Regardless, Arm preserved its lost-royalties theory of harm...........................20

4. Even were this a case- or discovery-management issue, the district court abused its discretion ..............................................22

B. A Reasonable Jury Could Have Found Harm To Arm's Licensing Ecosystem From Nuvia's Breach .......................................22

C. Nuvia's Breach Alone Is Sufficient Evidence Of Harm ......................25

III. GRANTING RELIEF ON EITHER CLAIM REQUIRES A NEW TRIAL ON ANY REMAINING CLAIMS .....................................................26

A. Judgment For Arm On The Qualcomm-ALA Counterclaim Requires A New Trial On Both Of Arm's Breach Claims .................26

B. A New Trial On Arm's Nuvia-Breach Claim Requires A Complete New Trial ........................................................................27

CONCLUSION .........................................................................................29

# TABLE OF AUTHORITIES

**Cases**

*Artifex Software v. Hancom*,
  No. 16-cv-06982-JSC, 2017 WL 1477373 (N.D. Cal. 2017)............................24

*Avaya v. Telecom Labs*,
  838 F.3d 354 (3d Cir. 2016) .......................................................................26, 27

*Banjo Buddies v. Renosky*,
  399 F.3d 168 (3d Cir. 2005) ...............................................................................21

*Cooper Distrib. v. Amana Refrigeration*,
  180 F.3d 542 (3d Cir. 1999) ...............................................................................15

*Correa v. Hosp. San Francisco*,
  69 F.3d 1184 (1st Cir. 1995).................................................................................22

*Deffenbaugh-Williams v. Wal-Mart*,
  188 F.3d 278 (5th Cir. 1999) ..............................................................................14

*Douglas Dynamics v. Buyers Prods.*,
  717 F.3d 1336 (Fed. Cir. 2013) .....................................................................21, 25

*DVD Copy Control v. Kaleidescape*,
  No. 1-04-CV-031829, 2012 WL 12987159 (Cal. Super. Ct. 2012) ...................24

*Elation Sys. v. Fenn Bridge*,
  71 Cal. App. 5th 958 (2021) ...............................................................................25

*Encompass Off. Sols. v. La. Health Serv. & Indem.*,
  919 F.3d 266 (5th Cir. 2019) ..............................................................................28

*Founding Members of the Newport Beach Country Club v. Newport
  Beach Country Club*,
  109 Cal. App. 4th 944 (2003) .............................................................................11

*Garcia v. McCutchen*,
  16 Cal.4th 469 (1997) .............................................................................................8

*Gasoline Prods. v. Champlin Refin. Co.*,
   283 U.S. 494 (1931)..................................................................27, 28

*In re Lemington Home for the Aged*,
   777 F.3d 620 (3d Cir. 2015) ...............................................................16

*LNC Invs. v. First Fid. Bank*,
   126 F. Supp. 2d 778 (S.D.N.Y. 2001) .................................................19

*Mancini v. Northampton Cnty.*,
   836 F.3d 308 (3d Cir. 2016) ...............................................................22

*McCaig v. Wells Fargo Bank*,
   788 F.3d 463 (5th Cir. 2015) ..............................................................14

*Morey v. Vannucci*,
   64 Cal. App. 4th 904 (1998) ...............................................................10

*Omega Pats. v. CalAmp*,
   13 F.4th 1361 (Fed. Cir. 2021) ...........................................................19

*Padillas v. Stork-Gamco*,
   186 F.3d 412 (3d Cir. 1999) ...............................................................24

*Reeves v. Sanderson Plumbing Prods.*,
   530 U.S. 133 (2000)..............................................................18, 19, 24

*Robinson v. First State Cmty. Action Agency*,
   920 F.3d 182 (3d Cir. 2019) ...............................................................14

*S. Cal. Edison v. Superior Ct.*,
   37 Cal. App. 4th 839 (1995) ...............................................................10

*Safeco Ins. v. Robert S.*,
   26 Cal.4th 758 (2001) ...........................................................................5

*Scheenstra v. Cal. Dairies*,
   213 Cal. App. 4th 370 (2013) ...........................................................2, 3

*Simmons v. City of Philadelphia*,
   947 F.2d 1042 (3d Cir. 1991) .............................................................18

*Simone v. Golden Nugget Hotel & Casino*,
    844 F.2d 1031 (3d Cir. 1988) ...............................................................28

*Sweet v. Johnson*,
    169 Cal. App. 2d 630 (1959) ...............................................................15

*Tamarind Lithography Workshop v. Sanders*,
    143 Cal. App. 3d 571 (1983) ..........................................................20, 25

*Teva Branded Pharm. Prods. v. Amneal Pharms of N.Y.*,
    124 F.4th 898 (Fed. Cir. 2024) ..............................................................9

*United States v. Ozcelik*,
    527 F.3d 88 (3d Cir. 2008) ...................................................................14

*VFLA Eventco v. William Morris Endeavor Ent.*,
    100 Cal. App. 5th 287 (2024) ...............................................................11

*Vizzini v. Ford Motor*,
    569 F.2d 754 (3d Cir. 1977) .................................................................28

*Wagner v. Columbia Pictures*,
    146 Cal. App. 4th 586 (2007) .................................................................3

*Warner Constr. v. City of Los Angeles*,
    2 Cal.3d 285 (1970) .............................................................................10

*Whelan Assocs. v. Jaslow Dental Lab'y*,
    797 F.2d 1222 (3d Cir. 1986) .................................................................9

*Whelan v. Abell*,
    48 F.3d 1247 (D.C. Cir. 1995) .............................................................28

*Williams v. Coleman*,
    70 Cal. App. 400 (1924) .......................................................................26

*Wolf v. Walt Disney Pictures & Television*,
    162 Cal. App. 4th 1107 (2008) ............................................................3, 9

*ZF Meritor v. Eaton*,
    696 F.3d 254 (3d Cir. 2012) .................................................................22

**Other Authorities**

*Wright & Miller's Federal Practice and Procedure* (Apr. 2026 update)..................................................................................................15

**INTRODUCTION**

Defendants signed contracts agreeing to strict rules on their use of Arm's technology—then broke those rules to save billions in royalties. They cannot escape liability for that conduct by deferring to the jury on a purely legal question for one claim and disregarding evidence that properly went to the jury on another.

When Qualcomm acquired Nuvia, it impermissibly obtained core designs developed under *Nuvia's* ALA—not Qualcomm's. Qualcomm then placed that Nuvia-created RTL in Qualcomm's cores. The Qualcomm ALA's unambiguous text prohibits that: Qualcomm's cores must be developed by or for Qualcomm, using only "Arm Technology," a narrowly defined term limited to technology Arm delivered to Qualcomm under the Qualcomm ALA. Qualcomm's cores containing Nuvia RTL satisfy none of those requirements.

Qualcomm knows the ALA's text is a problem. Rather than meaningfully engage with it, Qualcomm retreats to procedural objections and irrelevant extrinsic evidence. But Arm preserved its legal argument by moving for judgment as a matter of law. And Qualcomm gets California law wrong when it argues that (irrelevant) extrinsic evidence makes the ALA's plain meaning a jury question. So this claim rises and falls on the ALA's text. Forced to confront the contractual language, Qualcomm does not dispute that Nuvia's RTL was created by Nuvia, for Nuvia, using technology Arm delivered to Nuvia under the Nuvia ALA—and thus did not

qualify as "Arm Technology" under the Qualcomm ALA. Instead, Qualcomm argues that so long as Qualcomm performed even a sliver of core development, an entire core is licensed. That conflicts with the Qualcomm ALA's detailed requirements and would severely erode Arm's intellectual-property rights.

On Arm's breach claim against Nuvia, Nuvia fails to meet the demanding standard for showing no reasonable jury could find harm. It barely addresses the district court's departures from Rule 50 standards. And it has no meaningful answer for its failure to seek a limiting instruction on evidence *it* introduced—but now contends cannot have been considered—or to Arm's repeated disclosures of its harm theories. Instead, Nuvia resorts to reweighing evidence, confirming the impropriety of judgment as a matter of law.

Finally, if this Court grants relief on either claim, a complete retrial is warranted because all three claims turn on overlapping facts and evidence.

## ARGUMENT

**I. THE DISTRICT COURT ERRED IN DENYING ARM JUDGMENT ON WHETHER QUALCOMM'S ALA COVERS CORES CONTAINING PRE-ACQUISITION NUVIA CODE**

In arguing the ALA's meaning was for the jury (Response.Br.26-31, 35-37), Qualcomm misconstrues California law. Contractual interpretation becomes a jury question only when (1) the contract is ambiguous and (2) resolving that ambiguity implicates conflicting extrinsic evidence. Opening.Br.17-18; *Scheenstra v. Cal.*

*Dairies*, 213 Cal. App. 4th 370, 390 (2013).   While extrinsic evidence may illuminate ambiguity, it "is not admissible to contradict express terms in a written contract."   *Wagner v. Columbia Pictures*, 146 Cal. App. 4th 586, 592 (2007) ("[P]arol evidence is not admissible to show that when the parties said five hundred feet they agreed it should mean one hundred inches.") (quotation marks omitted).

Qualcomm can satisfy neither requirement.  No amount of extrinsic evidence can alter the plain meaning of terms like "by or for" Qualcomm or "delivered by ARM or a Controlling Party to" Qualcomm.  Thus, "judicial inquiry into meaning is finished" based on the ALA's unambiguous text alone.  *Scheenstra*, 213 Cal. App. 4th at 390.  Even were the ALA ambiguous, no extrinsic evidence requires a jury determination.  A contract does not raise a fact question merely because different inferences may be drawn from extrinsic evidence; rather, the evidence must conflict or implicate a credibility issue.  *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1126-27 (2008).  None of Qualcomm's evidence does so.

### A.    Qualcomm Attempts To Rewrite The Qualcomm ALA's Unambiguous Text

The Qualcomm ALA is clear:  Qualcomm cannot use the RTL Nuvia developed under Nuvia's ALA before the acquisition—and Qualcomm concedes it did just that (Response.Br.2-3).  To be licensed under the Qualcomm ALA, an Architecture Compliant Core must be developed "by or for Licensee"—here, Qualcomm—"under the licenses granted in this Annex 1" to Qualcomm's ALA.

Appx6932, 6935. And the only Arm technology Qualcomm is permitted to use is "Arm Technology," defined as technology "delivered by Arm or a Controlling Party to Licensee"—here, Qualcomm—"under this ALA." Appx6886. Indeed, the Qualcomm ALA states that Qualcomm has no license to "use any Arm technology" other than the defined "Arm Technology." Appx6891. Finally, the ALA identifies "RTL design" as a stage in designing an Architecture Compliant Core. Appx6935.

Under those unambiguous provisions, Qualcomm was not licensed to use Nuvia's RTL in Qualcomm's cores. Because RTL design is a stage in core design, Qualcomm's use of RTL based on any Arm technology must conform to the Qualcomm ALA's requirements. But undisputed evidence showed that Nuvia's RTL used technology Arm delivered to *Nuvia* under the *Nuvia* ALA, which was outside the scope of "Arm Technology" licensed to Qualcomm. Nuvia also designed that RTL "for" *Nuvia* pre-acquisition, meaning it was not designed "by or for" Qualcomm. And Nuvia did so under the *Nuvia* ALA, not the Qualcomm ALA. Opening.Br.22-24. Thus, Qualcomm's use of Nuvia's RTL satisfies *none* of the Qualcomm ALA's requirements.

Qualcomm does not dispute any of those facts. Nor does it argue that terms like "by or for," "delivered by," or "under this ALA" have different meanings. Instead, Qualcomm argues it may develop CPUs containing pre-acquisition Nuvia

RTL regardless of whether that RTL adheres to the Qualcomm ALA's terms. Response.Br.27. None of Qualcomm's arguments supports that atextual reading.

*First*, Qualcomm contends it was reasonable to conclude the requirement that an Architecture Compliant Core be developed "by or for" Qualcomm is satisfied so long as any part of that core is developed by Qualcomm. Response.Br.37-38. That is inconsistent with the unambiguous ALA and defies common sense. The ALA requires an Architecture Compliant Core be "developed by or for" Qualcomm—not "developed *at least in part* by or for" Qualcomm. Appx6932. Qualcomm is the one "insert[ing]" nonexistent words into the contract. *Safeco Ins. v. Robert S.*, 26 Cal.4th 758, 764 (2001). And none of Qualcomm's dictionary definitions (at 28) supports its view that the meaning of "develop" is "develop in part." To the contrary, they state development involves conduct "through a succession of states or changes," not a subset of them. Response.Br.28. The ALA expressly makes "*all* stages of implementation from specification through RTL design" "subject to the terms of the ALA." Appx6935 (emphasis added). While the ALA permits Qualcomm to engage a third party to design part of an Architecture Compliant Core "for" Qualcomm, it requires that work occur pursuant to the Qualcomm ALA's limitations and "at" Qualcomm's "site"—none of which covers the code Nuvia developed at Nuvia before Qualcomm's acquisition. Appx6890.

5

*Second*, Qualcomm points to ALA provisions stating that design work occurs in a multistage process, and that Qualcomm is licensed to use Arm Technology to design and develop cores at "all stages of implementation," not just the RTL design stage.  Response.Br.28-29, 38.  From this, Qualcomm surmises that as long as it "designed" the core, there is no prohibition on using RTL developed by or for another entity under another license.  Response.Br.28.  In support, Qualcomm also cites the verdict form, which asked whether Qualcomm's "*CPUs* were licensed." Response.Br.38 (emphasis Qualcomm's).

Qualcomm again rewrites the ALA.  The ALA plainly states that "RTL design" *is* one of the "stages of implementation" of Architecture Compliant Core design, during which Qualcomm may use only the "applicable Arm Technology." Appx6935.  Thus, if RTL design does not satisfy the terms of the Qualcomm ALA, core design does not satisfy the terms of the Qualcomm ALA.  The verdict form reflects that by asking whether Qualcomm's "CPUs *that include designs acquired in the Nuvia acquisition* are licensed under the Qualcomm ALA."  Appx0002 (emphasis added).

Contrary to Qualcomm's suggestion (Response.Br.40), Arm's reading of the "including all stages of implementation" provision does not depend on whether it modifies only "have designed" or also "design."  Either way, this provision confirms RTL design is a stage of core design, with all attendant requirements.  Nor did Arm

6

argue that Qualcomm may not design cores at all stages of implementation (Response.Br.40); Arm argued that such design must comply with the Qualcomm ALA.[1]

*Third*, Qualcomm never disputes that its ALA expressly prohibits Qualcomm from using any "Arm technology" beyond the defined "Arm Technology" that Arm delivered to Qualcomm under the Qualcomm ALA.  Qualcomm argues that the Nuvia RTL is not "Arm technology" because Arm did not create the RTL and does not own it.  Response.Br.39.  Even if true, that does not matter.  Qualcomm never disputes that Nuvia created the RTL using the technology that Arm supplied to Nuvia under the Nuvia ALA.  The Qualcomm ALA expressly prohibits Qualcomm from using that "Arm technology" for any purpose—including by placing Nuvia RTL into Qualcomm's cores.  (Indeed, Nuvia did not merely use "Arm technology" when creating that RTL; its own ALA makes clear that the RTL is a "derivative" of "Arm Technology" as that term is defined in the Nuvia ALA.  Opening.Br.22-24; *see, e.g.*, Appx5937 (Arm's expert testimony).)  Allowing Qualcomm to carve out the Nuvia RTL from the ALA's restrictions on Qualcomm's use of "Arm

---

[1] Qualcomm argues that "unrefuted evidence" shows Qualcomm "performed every stage of design and development." Response.Br.38.  None of the testimony Qualcomm cites supports that.  In fact, Qualcomm acknowledges it "used some RTL that Nuvia wrote."  Response.Br.12.

technology" would undermine Arm's intellectual-property rights and carefully negotiated ALAs.

*Fourth*, Qualcomm argues that the ALA and Annex 1 contain conflicting definitions of "Arm Technology" and that the controlling definition is Annex 1's. Response.Br.39-40.     That definition omits the ALA's delivered-by-Arm requirement—a requirement not satisfied here because Nuvia's RTL used technology Arm delivered to Nuvia, not Qualcomm.  Response.Br.39-40.  But  no conflict exists.  The ALA states that Arm Technology is "the technology identified in each Annex and any Extensions and Updates thereto delivered by Arm or a Controlling Party to Licensee under this ALA." Appx6886.  That mirrors Annex 1's statement that "Arm Technology" is the technology "identified in this Annex 1"— technology that was delivered by Arm pursuant to the ALA.  Appx6932; *see* Appx6930 (listing "[d]eliverables" of Arm Technology).  At the very most, section 1.3 poses an additional, more specific requirement, which would not present a conflict.  *Cf. Garcia v. McCutchen*, 16 Cal.4th 469, 478 (1997) (provisions "not irreconcilable" if they can be "reasonably harmonize[d]").  And none of this changes the separate requirement that an Architecture Compliant Core must be "developed by or for" Qualcomm "under the licenses granted in" the Qualcomm ALA. Appx6932, 6935.

*Finally*, Qualcomm treats Arm's position as absurd because it would mean that if part of a core were unlicensed under the Qualcomm ALA, the entire core is unlicensed under the Qualcomm ALA.  Response.Br.41.  Qualcomm fails to explain what is absurd about treating a product comprising both unlicensed and licensed components as unlicensed.  As courts have explained in the analogous context of infringement, "[e]ven if the product of the alleged infringer's efforts is a mixture of old and new elements, that would not protect it from the charge of infringement." *Whelan Assocs. v. Jaslow Dental Lab'y*, 797 F.2d 1222, 1237 n.32 (3d Cir. 1986); *see Teva Branded Pharm. Prods. v. Amneal Pharms of N.Y.*, 124 F.4th 898, 913-14 (Fed. Cir. 2024) (a product claim "is infringed by making or selling … an article that contains the claimed product, even though the larger article contains additional unclaimed features").

### B.    None Of The Extrinsic Evidence Qualcomm Cites Turns The Meaning Of The Qualcomm ALA Into A Factual Issue Or Supports Qualcomm's Atextual Reading

Even were the Qualcomm ALA ambiguous, none of Qualcomm's extrinsic evidence is relevant to resolving that ambiguity because that evidence does not conflict.  *Wolf*, 162 Cal. App. 4th at 1126-27.  As Qualcomm's own cases show, evidence must implicate a credibility issue to conflict.  In *Morey v. Vannucci* (cited at Response.Br.36, 37, 42, 43), one party "testified that during negotiations," his counterparty "suggested the term 'affiliated entities'" covered a certain scope of

companies—but that counterparty "testified that during negotiations, he explicitly told" the other it covered a broader scope. 64 Cal. App. 4th 904, 914 (1998). Thus, "[b]efore the disputed contractual language could be interpreted, the jury had to decide whether to believe" one party's testimony or "the contrary testimony." *Id.* And in *Warner Construction v. City of Los Angeles*, interpreting "sand with clay binder" required assessing the credibility of testimony on the term's "trade" meaning. 2 Cal.3d 285, 291 (1970).

None of the extrinsic evidence here—to the extent it can be considered at all—is conflicting in the required sense. For example, Qualcomm insists Arm employees' internal discussions, which took place eight years after the ALA's execution, are relevant to interpreting the parties' intent at the time of execution. Response.Br.29, 42. But even assuming (counterfactually) that those internal discussions were held at the time of negotiation, uncommunicated subjective intent cannot bear on contract interpretation. Opening.Br.33. The decision Qualcomm cites does not suggest otherwise. In *Southern California Edison v. Superior Court*, the relevant evidence of a party's "practical interpretation" consisted of "statements" made externally, both to investors and to its counterparty. 37 Cal. App. 4th 839, 850-51 (1995). But Arm's statements were never communicated outside the company. They are more like the statements in *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club*—a case Arm cited and Qualcomm ignores—where

10

"[c]onversations between" a party's former employees "d[id] not reflect" that party's "objective intent" and thus could not be considered. 109 Cal. App. 4th 944, 960 (2003); *see VFLA Eventco v. William Morris Endeavor Ent.*, 100 Cal. App. 5th 287, 302 (2024) (deeming irrelevant declarations relaying "undisclosed understanding" of contract).

Nor do those internal communications (or any other evidence Qualcomm cites) raise a factual dispute. The parties do not disagree about the customary meaning of certain terms or what they stated during negotiations. Instead, Qualcomm unsuccessfully tries to leverage communications whose content is uncontested, and that occurred years after execution, to change the Qualcomm ALA's unambiguous meaning.

For instance, Qualcomm argues the parties' communications requesting Arm's consent to having "former Nuvia employees continue their activities under the Qualcomm ALA" were about the Nuvia ALA, not limitations to the Qualcomm ALA. Response.Br.42-43; Appx9334, 7116-7117, 7119-7120; *see* Appx5628 (Arm witness testifying Qualcomm "indicated an understanding that consent was required" to transfer Nuvia code). But Qualcomm never disputed what it told Arm, making this a legal question. Nor does the testimony of a Qualcomm employee describing those communications raise a conflict (*contra* Response.Br.30): that employee stated, consistent with the letter's text, that Qualcomm "wanted to make

11

clear that when the acquisition was to close … the work of Nuvia and its employees would be consumed in, or transferred into Qualcomm," "[a]nd then that work and their employees would be conducted under the Qualcomm ALA." Appx6022. And Arm's statement to regulators that ALA licensees do "not need anything further to design their own CPUs" (Appx8931) simply describes what the ALAs do: permit a licensee to use Arm technology to design CPUs *under the license terms.* The only reasonable inference is that Qualcomm's pre-dispute understanding was it could not use Nuvia code absent Arm's consent. Opening.Br.8-9, 21-22, 34-35.

Qualcomm also points to Arm's certification of Qualcomm CPUs. Response.Br.30. That implicates no factual dispute: Arm does not contest it provided those certifications. Regardless, Arm's certifications addressed a different issue—whether CPUs complied with specific technical requirements. Appx5905, 6860-6861, 6145-6146. And they occurred after Nuvia certified it was not using, and had returned or destroyed, Arm Technology and its derivatives—including the RTL code. Appx6885; Opening.Br.49-51. Defendants' deception cannot support an inference that Arm permitted Qualcomm to include Nuvia code in those CPUs. Indeed, once Arm learned Qualcomm was seeking certification of CPUs containing Nuvia RTL, it notified Qualcomm that was "unacceptable." Appx5676; *see* Appx8977-8980 (Qualcomm-cited Arm communications stating same).

12

As for the other internal Arm communications, they discussed work former Nuvia employees might perform under the Qualcomm ALA *post*-acquisition. *E.g.*, Appx8723, 8787, 5708, 8735, 8881. Qualcomm quibbles that Arm introduced no trial testimony on that topic (Response.Br.42), but the communications speak for themselves. Whether the contractual meaning Qualcomm would draw from these communications is reasonable (it is not, Opening.Br.33 n.3) is for the court, not the jury.

### C. None Of Arm's Litigation Conduct Erased The Need For The District Court To Apply Correct Law And Interpret The Qualcomm ALA

None of Arm's litigation conduct absolved the district court of its duty to resolve this issue as a matter of law. Qualcomm quotes Arm's statement in its summary-judgment opposition that "genuine disputes of fact" existed on the Qualcomm-ALA issue. Response.Br.32. That ignores that brief's principal argument: that "the plain language of Qualcomm's ALA disclaims a license to Arm technology developed under another ALA." Appx3478; Opening.Br.30. Arm's *back-up* argument—that were there "any doubt" on that question, "the parties' past practice and witness testimony" created "a genuine issue of fact"—does not establish forfeiture. Appx3479. And were the Court to conclude that these litigation statements have the impact Qualcomm demands, that conclusion should apply with even greater force to Qualcomm, which argued in its pretrial submission that

"[d]efendants consider all issues related to contract interpretation to be issues of law." Appx5109; *see* Appx6326-6327 (Qualcomm moving for JMOL that its "products are licensed under its own ALA").

Qualcomm also contends Arm forfeited judgment as a matter of law by proposing jury instructions on contract interpretation. Response.Br.33-34. But Qualcomm fails to respond to the multiple authorities Arm cited explaining that objecting to jury instructions is unnecessary to preserve a judgment-as-a-matter-of-law argument. Opening.Br.28-29 (collecting cases); *see Deffenbaugh-Williams v. Wal-Mart*, 188 F.3d 278, 284 n.5 (5th Cir. 1999) ("[F]ailure to request a jury instruction does not preclude a later JMOL."). That principle applies regardless of whether a party failed to object or affirmatively proposed instructions: either way, the JMOL inquiry must apply the correct law even if inconsistent with instructions. *Contra* Response.Br.35. None of Qualcomm's cases (at 34) suggests otherwise; they are jury-instruction appeals challenging the content of instructions, not the submission of an issue to the jury. *McCaig v. Wells Fargo Bank*, 788 F.3d 463, 476 (5th Cir. 2015); *United States v. Ozcelik*, 527 F.3d 88, 97 n.6 (3d Cir. 2008); *Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 188-89 (3d Cir. 2019). Indeed, in *Robinson*, the Court observed that the appellant had failed to raise the error in its "post-trial briefing, nor did it move for judgment as a matter of law on those grounds." *Id.* Here, Arm did both.

14

In any event, it would have been futile to object to instructions when the court had already resolved to send the Qualcomm-ALA issue to the jury. *Cooper Distrib. v. Amana Refrigeration*, 180 F.3d 542, 550 (3d Cir. 1999) (acknowledging rule of no forfeiture "when a party has previously made its position clear to the trial judge and any further attempt to change the judge's mind would have been futile" (quotation marks omitted)); 9C *Wright & Miller's Federal Practice and Procedure* §2553 (Apr. 2026 update). Given that decision, Arm had no choice but to participate in submission of jury instructions on the Qualcomm-ALA question. That is equally true where the court deferred ruling on Arm's 50(a) motion rather than rejecting it outright. *Contra* Response.Br.34-35. Indeed, were Qualcomm's position correct, a party could not participate in formulating jury instructions on any issue on which it had moved for judgment under Rule 50, at risk of forfeiture.

## II.   THE DISTRICT COURT ERRED IN GRANTING JUDGMENT FOR NUVIA ON HARM

California's requirement that a breach-of-contract plaintiff establish harm is not demanding. *See Sweet v. Johnson*, 169 Cal. App. 2d 630, 632 (1959) ("The maxim that the law will not be concerned with trifles does not, ordinarily, apply to violation of a contractual right."). Arm more than met its burden by presenting evidence of three kinds of harm: lost royalties, harm to its licensing ecosystem, and the breach itself. That was more than sufficient to preclude JMOL, which would have been proper only if the record was "critically deficient of that minimum

15

quantity of evidence from which a jury might reasonably afford relief." *In re Lemington Home for the Aged*, 777 F.3d 620, 626 (3d Cir. 2015). The district court misapplied Rule 50 standards, improperly discounting Arm's evidence and drawing inferences against Arm.

### A. A Reasonable Jury Could Have Found Arm Lost Royalties Because Of Nuvia's Breach

#### 1. *Both parties introduced more than sufficient evidence that Nuvia's breach caused Arm to lose royalties*

The record leaves no doubt that Arm would have earned substantially higher royalties but for Nuvia's breach. When defendants transferred Nuvia's pre-acquisition code to Qualcomm and refused to pay the Nuvia ALA's higher royalty rates, Arm lost billions in royalties. Opening.Br.9, 36. And without access to Nuvia's code, Qualcomm would have used more Arm-designed cores under the Qualcomm TLA, at rates higher than what Qualcomm paid under its ALA. Opening.Br.36-37.

Defendants cannot erase this ample royalty evidence, much of which they introduced and emphasized. Opening.Br.37. For example, defendants repeatedly elicited testimony about Nuvia's "much higher" royalty rates. Appx6218; *see* Appx5652-5653 (testimony that Arm wanted Qualcomm to "adopt the terms that were in the Nuvia ALA" "including the royalty rates"); Appx5698 (testimony that Arm believed Qualcomm would pay $50 million a year less in royalties). In opening

16

and closing statements, defendants highlighted that Arm predicted "royalties will go way, way down" and "demanded that Qualcomm pay much higher royalties," but that Qualcomm "did not want to pay these very high rates." Appx5548-5551, 6481.

Defendants claim that Arm's first category of lost royalties—from defendants' failure to pay the Nuvia ALA's higher rates—arose from *Qualcomm*'s sales, not *Nuvia*'s conduct. Response.Br.49-50. But that overlooks the core facts underlying Arm's claims. It was Nuvia's improper conduct that caused Arm to terminate the Nuvia ALA. And Nuvia's violation of its post-termination obligation to stop using the RTL it created pre-acquisition using Arm's technology enabled defendants to reap the benefits of that RTL while escaping Nuvia's higher royalty rates. Decoupling Nuvia's failure to stop using its pre-acquisition code from Qualcomm's sale of products containing that code is illogical. Opening.Br.10. Concluding otherwise would allow defendants to benefit from Nuvia's material breaches without consequence.

Defendants also claim Arm's other form of royalties harm—that without the breach Qualcomm would have used more Arm-designed cores under the Qualcomm TLA, at rates higher than under its ALA—is speculative. Response.Br.50. *But see* Response.Br.13 (noting "Arm recognized that Qualcomm's shift from off-the-shelf CPUs to custom CPUs would reduce Arm's revenue by hundreds of millions of dollars annually"). To the contrary, Arm presented evidence of such harm:

17

Qualcomm's CEO testified that he justified the Nuvia acquisition to his board as a "make versus buy" situation where Qualcomm "will be able to design our own so we'll pay less royalties because we'll pay ALA royalties." Appx6282. Qualcomm anticipated paying up to $1.4 billion less annually (Appx6282-6283, 7503), while Arm estimated losing $350 million per year in royalties (Appx8786). As for Nuvia's suggestion that Arm should have asked Qualcomm's witnesses *more* questions "about how Qualcomm would have proceeded" had Nuvia honored its obligations (Response.Br.50): granting JMOL simply because additional, hypothetically stronger evidence could have been introduced is improper. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 152-53 (2000).

### 2. *The district court wrongly limited use of Arm's royalties evidence despite never precluding the jury from considering such evidence for harm*

At trial, the court instructed the jury that Arm must prove it had "suffered harm." Appx6407. The court never told the jury it could not consider the ample lost-royalties evidence when deciding that question. But on JMOL, the district court ruled that Arm was "foreclosed" from pursuing its royalties harm theory (Appx0019-0020), effectively imposing a post-trial limiting instruction on Arm's harm evidence. Opening.Br.38. The court's untimely imposition of that limitation violates the JMOL standard. *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1082 (3d Cir.

1991) (opinion of Becker, J.) (seeking judgment under these circumstances requires "the court to function as the jury in finding new facts").

Similarly, Nuvia failed to request any limiting instruction on royalty evidence, did not object to Arm's presentation of that evidence, and introduced that evidence itself. Opening.Br.37. Nuvia accordingly "waived" any argument that Arm "presented [an] improper theory to the jury" based on this properly admitted evidence. *Omega Pats. v. CalAmp*, 13 F.4th 1361, 1372 (Fed. Cir. 2021).

Nuvia hardly responds to Arm's extended arguments (Opening.Br.37-40) about the district court's errors. It asserts without elaboration that the court "simply applied the Rule 50 standard to hold that, because Arm was forbidden from presenting its lost-royalties theory, the theory could not support a jury verdict for Arm" on harm. Response.Br.49. This conclusory statement fails to explain why Rule 50 permitted the court to retroactively limit the relevance of record evidence offered by both parties, based on a colloquy the jury never heard and a limiting instruction never given. JMOL principles compel the opposite conclusion. *Reeves*, 530 U.S. at 151 (Rule 50 requires "review[ing] the record as a whole"); *LNC Invs. v. First Fid. Bank*, 126 F. Supp. 2d 778, 785 (S.D.N.Y. 2001) (JMOL turns on "the record actually made"). And Nuvia has no explanation for why it failed to seek any limiting instruction.

### 3.    *Regardless, Arm preserved its lost-royalties theory of harm*

The district court's error is compounded by the fact that Arm timely and repeatedly disclosed this harm theory. Opening.Br.40-41. Royalty harm was Arm's primary response to defendants' summary-judgment argument that Arm failed to show harm. Appx3467-3468; *see* Appx5332-5334 (Arm's response to interrogatories); Appx5322-5325 (pre-trial letter to court identifying disclosures of royalties harm). Tellingly, Nuvia does not claim it lacked notice after that opposition. Instead, it challenges only Arm's reliance on its expert-report disclosure, contending that addressed Arm's ecosystem-harm theory only. Response.Br.49. But the expert's description of Arm's harm if Qualcomm could "commercialize" Nuvia's pre-acquisition development "work under Qualcomm's own *lower royalty rates*" put Nuvia on notice of *both* theories. Appx2109 (emphasis added).[2]

Nuvia also suggests that Arm did not initially embrace the royalties theory of harm out of concern it would preclude specific performance. Response.Br.47. But that overlooks that Arm opposed summary judgment on harm based on lost royalties, arguing specific performance was needed because this harm could not be fully quantified. *See* Appx3467-3472; *Tamarind Lithography Workshop v. Sanders*, 143 Cal. App. 3d 571, 575 (1983) (damages may be inadequate where "an accurate

---

[2] Arm's decision not to call that expert (Response.Br.49) does not change that his report disclosed Arm's lost-royalties theory *before* trial.

assessment of damages would be far too difficult and require much speculation"). That is not a novel position: damages are often an inadequate remedy for lost royalties. *Cf., e.g.*, *Douglas Dynamics v. Buyers Prods.*, 717 F.3d 1336, 1344 (Fed. Cir. 2013) (reversing denial of patent injunction because "[i]rreparable injury encompasses different types of losses that are often difficult to quantify, including lost sales"); *Banjo Buddies v. Renosky*, 399 F.3d 168, 176 (3d Cir. 2005) (disgorgement appropriate where plaintiff's estimation of lost sales was "too speculative").

Although the district court directed Arm on the morning of trial to submit proof of timely disclosure (Appx5501-5502), Arm reasonably understood this instruction to be moot as the trial unfolded and Nuvia made lost-royalties evidence central to its case. Nuvia introduced much of that evidence itself, and defendants emphasized lost royalties in opening and closing statements. Opening.Br.40-42. Any discussion outside the jury's presence that royalty evidence could come in for purposes other than harm (Response.Br.48) has no bearing on how the jury could consider that evidence based on the instructions it received.[3] Absent any limiting instruction, the jury was not barred from considering that evidence for harm. *E.g.*,

---

[3] Nuvia claims the parties "agreed" royalties evidence "could come in at trial *for other purposes*." Response.Br.48. It cites not an "agree[ment]" but its own pre-trial submission. Appx5118-5121.

21

*Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1191 (1st Cir. 1995) ("Evidence admitted without limitation can be used by the jury on any issue in the case.").

### 4.   *Even were this a case- or discovery-management issue, the district court abused its discretion*

Even were this a case-management issue, the district court erred. Opening.Br.42 (citing *ZF Meritor v. Eaton*, 696 F.3d 254 (3d Cir. 2012)). Nuvia ignores the court's failure to consider the *Meritor* factors, thus failing to defend the court's exercise of any case-management discretion it may have had.

To the extent the court's ruling was a discovery sanction, the court failed to conduct the required analysis. Opening.Br.43. It also incorrectly assumed that allowing Arm to pursue its royalties theory would prejudice Nuvia. Appx0019-0020. But Nuvia cannot credibly claim prejudice (Response.Br.48) when Arm timely disclosed that theory and when Nuvia made royalty savings central to its defense starting with its opening statement. Opening.Br.37, 40-42. Nuvia does not explain what it would have done differently had Arm made additional disclosures.

### B.   A Reasonable Jury Could Have Found Harm To Arm's Licensing Ecosystem From Nuvia's Breach

Arm also presented evidence that Nuvia's breach harmed Arm's licensing ecosystem, but the district court improperly discounted it by focusing on the absence of alternative evidence or on competing evidence. Opening.Br.43-45; *Mancini v. Northampton Cnty.*, 836 F.3d 308, 314 (3d Cir. 2016). Nuvia doubles down on the

22

court's errors, faulting Arm for not presenting evidence from third parties and citing evidence of Arm's "record licensing and royalty revenues after terminating the Nuvia ALA." Response.Br.44-45.[4]

The district court also erred by concluding that Arm's ecosystem harm theory "is further derailed by the jury's finding that Qualcomm's products were, in fact, licensed, given that a predicate to the purported harm is unlicensed use." Appx0019; *see* Opening.Br.45-46. Even were Qualcomm's products licensed by *its* ALA, that would not eliminate violation of the *Nuvia* ALA, a separate contract. Nuvia implicitly concedes this by not disputing that the court erred—instead minimizing it as a "brief observation in a single sentence." Response.Br.46. A succinctly stated error is still an error.

Nuvia's other arguments against Arm's ecosystem theory fail. *First*, Nuvia contends that Arm's evidence of ecosystem harm is "speculative." Response.Br.45-46. But Arm's CEO testified that "contracts are the only tool that we have to protect our inventions," and explained that the harm from "the unlicensed technology that exist[s] inside these Qualcomm products" "is that it doesn't reflect the Nuvia deal,"

---

[4] Nuvia speculates Arm's licensees knew about Nuvia's breach only because Arm "inform[ed] them of the litigation." Response.Br.45. But "Arm partners" "were seeing press releases" and asking "questions" about the lawsuit. Appx5617-5618. Regardless, Nuvia never explains why that would make Arm's harm evidence irrelevant.

and "the products are in the market now." Appx5682, 5684.[5]  Arm's CEO also stated that when Qualcomm uses Arm's technology in an unlicensed way, "[b]y not working with us to promote our technology being inside their chips, it hurts us" and "it hurts the whole ecosystem." Appx5674.  Arm highlighted this harm in closing, explaining it could not "let defendants use our technology unlicensed" because "we're in the IP licensing business, contracts are what we have, that is our lifeblood." Appx6444-6445.

*Second*, Nuvia fails to distinguish Arm's cases. Response.Br.46.  Nuvia faults Arm for not introducing expert-economist evidence, as the plaintiff did in *DVD Copy Control v. Kaleidescape*, No. 1-04-CV-031829, 2012 WL 12987159, at *26 (Cal. Super. Ct. 2012).  But expert evidence was not required.  *Cf. Padillas v. Stork-Gamco*, 186 F.3d 412, 415-16 (3d Cir. 1999) ("non-expert evidence" sufficient to create factual issue even on "complex and technical questions").  And it would be improper to discount Arm's evidence by focusing on hypothetical alternatives. *Reeves*, 530 U.S. at 152-53.  Nor was the description of ecosystem harm in *Artifex Software v. Hancom* limited to economic benefits.  No. 16-cv-06982-JSC, 2017 WL 1477373, at *3 (N.D. Cal. 2017) (recognizing "substantial benefits, *including*

---

[5] Nuvia asserts Arm admitted it "had not suffered any concrete harm." Response.Br.44 (citing Appx5683-5685).  But the cited testimony explains Arm *had* suffered "concrete harm" because "unlicensed technology based on a Nuvia design is now in the market." Appx5683-5684.

economic benefits," to commercial licensing regime "that range far beyond traditional license royalties" (emphasis added)); *cf. Douglas Dynamics*, 717 F.3d at 1345 (describing harm to patentee "if its dealers and distributors believed it did not enforce its intellectual property rights").

*Third*, Nuvia argues that Arm's ecosystem harm is attributable only to *Qualcomm*, not Nuvia. But this harm does not depend only on "*Qualcomm's* marketing of chips years after the Nuvia acquisition." Response.Br.45 (original emphasis). Arm also suffered ecosystem harm separate from any product commercialization. By continuing to use its pre-acquisition code and transferring it to another licensee as part of a lucrative transaction in violation of its ALA, *Nuvia* benefited. That this conduct involved another Arm licensee does not make it less harmful—especially because *Nuvia*'s breach enabled Qualcomm to ship and "market[]" cores containing Nuvia's pre-acquisition code.

## C.    Nuvia's Breach Alone Is Sufficient Evidence Of Harm

Nuvia's breach alone also establishes harm. Opening.Br.47-48. "[F]ailure to perform a contractual duty is, in itself, a legal wrong that is fully distinct from the actual damages." *Elation Sys. v. Fenn Bridge*, 71 Cal. App. 5th 958, 965-66 (2021). Arm does not dispute it must show harm. *Contra* Response.Br.51-52. Arm's position is that, given its request for specific performance, it need not show appreciable *damages*. *Tamarind Lithography*, 143 Cal. App. 3d at 575-76. That

25

accords with the principle that specific performance may be appropriate even "when no actual injury has as yet been sustained, but is only apprehended." *Williams v. Coleman*, 70 Cal. App. 400, 405 (1924). Nor does the fact that Arm is not seeking nominal damages undermine those principles. Instead, the availability of nominal damages under California law confirms the breach itself is a cognizable form of harm. Opening.Br.47-48.

## III. GRANTING RELIEF ON EITHER CLAIM REQUIRES A NEW TRIAL ON ANY REMAINING CLAIMS

Defendants' arguments against a complete new trial (Response.Br.52-53) fail.

### A. Judgment For Arm On The Qualcomm-ALA Counterclaim Requires A New Trial On Both Of Arm's Breach Claims

Judgment for Arm on the Qualcomm-ALA issue requires a complete new trial because Qualcomm cannot show it is "highly probable that the error did not affect the outcome of the" verdict on the other two issues. *Avaya v. Telecom Labs*, 838 F.3d 354, 372, 396 (3d Cir. 2016). To the contrary, the district court's post-trial ruling shows its reasoning on Arm's breach claims was influenced by its ruling on the Qualcomm-ALA issue—and the jury was likely similarly influenced by defendants' trial statements. Opening.Br.52-54. Defendants' effort to brush aside that intermingling fails. They argue that the court's discussion of the Qualcomm-ALA verdict when ruling on the Nuvia-breach claim merely "bolster[ed]" its

26

independent conclusion (Response.Br.56)—but that was a key aspect of the court's reasoning (Appx0019).

Defendants also observe that the district court did not expressly mention the relationship between the Qualcomm-breach claim and the Qualcomm-ALA counterclaim. Response.Br.57. But the court's conclusion that the jury was entitled to find that Qualcomm did not assume the Nuvia ALA logically depended on its earlier conclusion that Qualcomm was permitted by the Qualcomm ALA to use Nuvia's RTL. Without the Qualcomm ALA, Qualcomm could have used the Nuvia RTL only by assuming the benefits of the Nuvia ALA. Opening.Br.53. Defendants have no response.

Finally, defendants argue there was no possibility the jury was influenced by defendants' argument that the Qualcomm ALA was a complete defense to Arm's breach claims because the jury heard that argument only twice. Response.Br.57. But that proves the point. That a prejudicial argument was twice made to the jury means Qualcomm cannot show that it was highly probable it did *not* affect the case's outcome. *Avaya*, 838 F.3d at 396.

## B.    A New Trial On Arm's Nuvia-Breach Claim Requires A Complete New Trial

Similarly, a new trial for Arm on the Nuvia-breach claim requires a complete new trial because all three claims were intertwined. *Gasoline Prods. v. Champlin Refin. Co.*, 283 U.S. 494, 500 (1931); Opening.Br.54-57 & n.5. Defendants misstate

the legal standard.  They argue "injustice" from a partial new trial must be shown even if claims are not distinct and separable.  Response.Br.54.  But lack of distinctness and separability alone renders a partial retrial unjust.  *Gasoline Prods.*, 283 U.S. at 500 (issue must be "so distinct and separable from the others that a trial of it alone may be had without injustice").

Defendants' other arguments fare no better.  They are incorrect (at 54) that the *Gasoline Products* rule is a verdict winner's right:  this Court and others have awarded full new trials to parties that lost below.  *E.g.*, *Simone v. Golden Nugget Hotel & Casino*, 844 F.2d 1031, 1040-41 (3d Cir. 1988); *Vizzini v. Ford Motor*, 569 F.2d 754, 761-62 (3d Cir. 1977); *Encompass Off. Sols. v. La. Health Serv. & Indem.*, 919 F.3d 266, 276-77 (5th Cir. 2019).  Qualcomm's only cited case, *Whelan v. Abell*, did not involve a complete-new-trial request.  48 F.3d 1247, 1252 (D.C. Cir. 1995).  Moreover, the "verdict winner's constitutional right" language defendants seize on—used when discussing other decisions that themselves did not concern *Gasoline Products*—was simply describing the procedural posture of those decisions, not any limitation on the *Gasoline Products* rule.  *Id.*

Nor can defendants make the requisite clear showing that either Arm's Qualcomm-breach claim or the Qualcomm-ALA counterclaim is distinct or separable from Arm's Nuvia-breach claim.  Defendants argue the Qualcomm-breach claim had a lack-of-assumption defense the Nuvia-breach claim did not.

28

Response.Br.54.  But just because one breach claim has a unique defense does not change the fact that they share overlapping parties, conduct, and underlying facts. *Supra* pp.27-28.

On the relationship between the Qualcomm-ALA counterclaim and the Nuvia-breach claim:  defendants cite no record evidence, nor make any argument of their own, that these claims are distinct and separable.  Instead, they rely on misreadings of Arm's statements from its JMOL briefing and trial.  But Arm simply explained that defendants' conduct could breach the Qualcomm ALA, the Nuvia ALA, or both.  Appx5530-5531, 6423, 6640.  And as with Arm's two breach claims, whether a particular defense is available for one claim but not another does not negate the overlapping nature of those claims.  Opening.Br.56.  As defendants acknowledge, they twice told the jury that the Qualcomm ALA was a complete defense to both of Arm's breach claims—yet now suggest this had *no* impact on the verdict.  *Supra* p.27.  Finally, defendants promise they will not raise the adverse verdicts in any retrial of the Nuvia-breach claim.  Response.Br.53.  But that would do nothing to cure the injustice of different juries deciding the same factual issues with potentially inconsistent findings.

## CONCLUSION

The judgment should be reversed in part and vacated in part.

29

Dated:  July 10, 2026

Respectfully submitted,

/s/ Joseph R. Palmore

GREGG F. LoCASCIO
JASON M. WILCOX
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004

JOSEPH R. PALMORE
ALISON H. HUNG
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
(202) 887-6940
jpalmore@mofo.com

SCOTT F. LLEWELLYN
MORRISON & FOERSTER LLP
370 17th Street, 4200 Republic Plaza
Denver, CO 80202

ERIK J. OLSON
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304

ALEXANDRA M. AVVOCATO
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019

*Counsel for Plaintiff-Appellant Arm Ltd.*

## CERTIFICATE OF COMPLIANCE, BAR MEMBERSHIP, AND ELECTRONIC VIRUS CHECK

The foregoing filing complies with the relevant type-volume, typeface, and type style requirements of the Federal Rules of Appellate Procedure and Local Appellate Rules because it has been prepared using a proportionally spaced typeface, including serifs, in 14-point Times New Roman font using Microsoft Word and includes 6,439 words, excluding the parts exempted by the Rules.

Pursuant to Local Appellate Rules 28.3(d) and 46.1(e), I hereby certify that I am an active member in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

Pursuant to Local Appellate Rule 31.1(c), I hereby certify that the text of the electronic brief is identical to the text of the paper copies, that the virus detection program Microsoft Defender was run on the electronic file containing this filing, and that no virus was detected.

Dated:  July 10, 2026                              /s/ Joseph R. Palmore
                                                            Joseph R. Palmore

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the CM/ECF system on July 10, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:  July 10, 2026                                    /s/ Joseph R. Palmore
                                                                   Joseph R. Palmore

MF-369807764